Paul K. VITALONE, Plaintiff,

v.

Kevin CURRAN and Richard Joseph, Defendants.

Civ. 85–0026–B.

United States District Court,
D. Maine.

July 17, 1987.

Mark L. Fortier, William Thomas Hyde, Hyde, Day & Ferris, Skowhegan, Me., for plaintiff.

Michael E. Saucier, Hunt, Thompson & Bowie, Portland, Me., for defendants.

## MEMORANDUM ORDER AND SCHEDULING ORDER

CYR, Chief Judge.

All parties object to some aspect of the Magistrate's Recommended Decision on defendants' motion for summary judgment.

### I. FACTS

On January 28, 1983, Officer Poirier, of the Skowhegan Police Department, discovered broken windows at a Skowhegan business establishment known as "Automotive Complete." Suspicious that a burglary had occurred or might be in progress, Poirier entered the building, which appeared to have been "evacuated." While inside, Poirier apparently "lost" his Skowhegan Police Department badge.

Until November 1982, "Automotive Complete" had been an automotive body shop which was owned and operated by plaintiff. On January 29, 1983,[1] while plaintiff was cleaning out these business premises pursuant to a court-ordered eviction, he discovered broken windows and found the police badge. The Skowhegan Police Department had not informed plaintiff of the broken windows or of Poirier's entry upon the premises because the information available to the Skowhegan Police Department did not reflect that plaintiff had any legal interest in the premises. Thus, unaware of the entry, plaintiff retained the police badge, believing that it was evidence of an illegal entry by the Skowhegan Police Department.

On the evening of February 1, 1983, Deputy Sheriff Ted Poulin, of the Somerset County Sheriff's Department, came to plaintiff's house to serve civil process in connection with the "Automotive Complete" eviction proceedings. Plaintiff showed Deputy Poulin the badge and discussed what plaintiff should do about it. Deputy Poulin advised plaintiff to turn the badge over to the Skowhegan police chief or a town selectman.

Plaintiff did not return the badge to the Skowhegan Police Department on February 2, 1983. The deputy police chief, to whom Poirier had reported the missing badge, apparently learned from Deputy Poulin[2] that plaintiff had the badge. On February 2, the deputy police chief contacted defendant Richard Joseph, a trooper with the Maine State Police (MSP), and asked Joseph to contact plaintiff and obtain the badge. The deputy chief instructed Joseph to summons plaintiff for theft if plaintiff refused to return the badge.[3]

Joseph and co-defendant Kevin Curran, also a MSP trooper, went to plaintiff's home, arriving sometime between 8:00 and 9:00 in the morning of February 3, 1983. Plaintiff, who had never met either defendant before, did not object to their entry.

The parties disagree as to the exact nature and sequence of the events after the defendants entered plaintiff's home. There is no dispute, however, as to the following events. Defendants requested that the

1. Defendants' Statement of Facts asserts that Poirier lost his badge on January 28 and that plaintiff found the badge on January 28. *See* Defendants' Statement of Facts, ¶ ¶ 1, 4. Plaintiff does not challenge these averments, *see* Plaintiff's Statement of Facts, ¶ 1; however, the record material cited by defendants indicates that the badge was lost on the evening of the 28th and was found by plaintiff on the 29th.

2. Plaintiff asserts that the deputy police chief spoke to Poulin about the badge and asked Poulin to obtain the badge from plaintiff, which Poulin refused to do on instructions from the sheriff. *See* Plaintiff's Statement of Facts, ¶ 5. Although defendants contend that these facts are "superfluous" because there is no evidence that defendants knew of these conversations, defendants do not dispute the truth of plaintiff's averments.

3. In responding to defendants' Statement of Facts, plaintiff contends that defendant Joseph was instructed to summons plaintiff for theft if he did not return the badge. *See* Plaintiff's Statement of Facts, at 6. Defendant does not challenge this contention. The record does not explain why the deputy chief of the local police force involved MSP troopers in obtaining the badge.

plaintiff give them the badge. Although plaintiff showed defendants the badge, he refused to give defendants the badge unless defendants gave him a receipt. Trooper Joseph refused to give plaintiff a receipt, however, on the ground that receipts were given only for evidence, and were not given to a person who was not the owner of the property at issue. Trooper Joseph and plaintiff argued for fifteen or twenty minutes, after which plaintiff told defendants to "get the f___ out," and, saying "no receipt, no badge," plaintiff threw the badge across the room.[4]

After plaintiff threw the badge across the room, defendant Joseph advised plaintiff that he was under arrest.[5] A struggle ensued during which both defendants sought to restrain plaintiff and place him in handcuffs. Plaintiff was dragged to the police cruiser, dressed in jeans, a t-shirt, and no shoes.[6]

Following plaintiff's arrest, defendants searched plaintiff's residence for approximately an hour and a half. The badge was not found.

## II. DISCUSSION

■ Defendants move for summary judgment on alternate grounds. First, de-

fendants assert that under *Parratt v. Taylor*, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), the existence of a state tort law remedy prevents plaintiff from maintaining an action under section 1983. Alternatively, defendants contend that they are entitled to qualified immunity. The United States Magistrate recommended the denial of defendants' motion for summary judgment on the *Parratt* ground, but recommended that summary judgment be granted in favor of the defendants, on grounds of qualified immunity, under the false arrest claim and the claim for use of excessive force.

The court reviews the recommended decision *de novo*. *See* 28 U.S.C. § 636(b).

### A. *Parratt*

In *Parratt v. Taylor*, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), Parratt, the prisoner-plaintiff, sued prison officials after a $23 hobby kit ordered and paid for by Parratt was lost in the prison mail system. Parratt claimed that the negligence of prison officials had deprived him of property without due process of law. The Court acknowledged that Parratt's claim satisfied three prerequisites of a valid due process claim: the prison officials were acting under color of state law; the hobby kit

---

**4.** The quoted language is the language which the defendants say was used by plaintiff. *See* Defendants' Statement of Facts, ¶ 15. Plaintiff likewise asserts that this language was used. *See* Plaintiff's Statement of Facts, ¶ 12. The Magistrate's Recommended Decision, however, states that plaintiff said "if you want the badge take it." Recommended Decision, at 2. Both versions of what was said are contained in the record. *See* Defendants' Statement of Facts Exhibits, Exhibit 4 at 43 ("if you want the badge take it"), Exhibit 7 at 123–24 ("get the f___ out," "no receipt, no badge"). As the parties agree that the latter language was used, the court accepts this version for the purpose of this motion.

**5.** The parties disagree as to the manner in which plaintiff was told that he was under arrest. Defendants state:

> Trooper Joseph advised the plaintiff that he was under arrest.... The arrest was for obstructing government administration.... Mr. Vitalone struggled and force was needed by both Trooper Curran and Trooper Joseph to restrain Mr. Vitalone and place him in hand-

cuffs.... Trooper Joseph broke his ankle during the course of the struggle with Mr. Vitalone.

Defendants' Statement of Facts, ¶ 16 [record citations omitted].

Plaintiff states:

> Trooper Joseph then cried out to Plaintiff that he was under arrest and immediately lunged at the Plaintiff and grabbed him.... The arrest was for obstructing governmental administration.... A struggle ensued in which Trooper Curran became involved, and the three men ended up in the living room with Plaintiff face down on the floor and the two Troopers sitting on his back.... The Troopers then placed Plaintiff in handcuffs.

Plaintiff's Statement of Facts, ¶ 13 [record citations omitted].

**6.** The parties agree that this is the way plaintiff was dressed when he was removed from his residence. They disagree, however, as to whether plaintiff refused to put more clothing on, *see* Defendants' Statement of Facts, ¶ 17, or whether defendants refused to permit plaintiff to get more fully dressed, *see* Plaintiff's Statement of Facts, ¶ 15.

constituted property; "and the alleged loss, even though negligently caused, amounted to a deprivation." [7]  451 U.S. at 536–37, 101 S.Ct. at 1913–14.  Parratt had not established, however, that the loss was "without due process of law."  The Court held that tort remedies provided by the state to redress a deprivation of property *after* the deprivation has occurred satisfied the requirements of procedural due process:

> The justifications which we have found sufficient to uphold takings of property without any predeprivation process are applicable to a situation such as the present one involving a tortious loss of a prisoner's property as a result of a random and unauthorized act by a state employee.  In such a case, the loss is not a result of some established state procedure and the State cannot predict precisely when the loss will occur.  It is difficult to conceive of how the State could provide a meaningful hearing before the deprivation takes place.  The loss of property, although attributable to the State action under "color of law," is in almost all cases beyond the control of the State.  Indeed, in most cases it is not only impracticable, but impossible, to provide a meaningful hearing before the deprivation.  That does not mean, of course, that the State can take property without providing a meaningful postdeprivation hearing.

451 U.S. at 541, 101 S.Ct. at 1916.

The *Parratt* court concluded:

> [R]espondent has not alleged a violation of the Due Process Clause of the Fourteenth Amendment.  Although he has been deprived of property under color of state law, the deprivation did not occur as a result of some established state procedure.  Indeed, the deprivation occurred as a result of the unauthorized failure of agents of the State to follow established state procedure.  There is no contention that the procedures themselves are inadequate nor is there any contention that it was practicable for the State to provide a pre-deprivation hearing.  Moreover, the State of Nebraska has provided respondent with the means by which he can receive redress for the deprivation.  The State provides a remedy to persons who believe they have suffered a tortious loss at the hands of the State.  See Neb.Rev.Stat. § 81–8.209 *et seq.* (1976).

451 U.S. at 543, 101 S.Ct. at 1917.

In *Hudson v. Palmer*, 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984), the Court extended the *Parratt* reasoning to *intentional* deprivations of property:

> If negligent deprivations of property do not violate the Due Process Clause because predeprivation process is impracticable, it follows that intentional deprivations do not violate that Clause provided, of course, that adequate state postdeprivation remedies are available.  Accordingly, we hold that an unauthorized intentional deprivation of property by a state employee does not constitute a violation of the *procedural requirements* of the Due Process Clause of the Fourteenth Amendment if a meaningful postdeprivation remedy for the loss is available.  For intentional, as for negligent deprivations of property by state employees, the State's action is not complete until and unless it provides or refuses to provide a suitable postdeprivation remedy.

104 S.Ct. at 3204 (footnote deleted, *emphasis added*).

The Magistrate rejected defendants' argument that *Parratt* and *Hudson* should be extended to an intentional deprivation of a *liberty* interest.  *See* Recommended Deci-

---

7. Insofar as *Parratt* held that *negligent* actions of state officials resulting in deprivations of property are actionable under the due process clause, it was overruled in *Daniels v. Williams*, 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986).  Noting that negligent actions by state officials resulting in the deprivation of property were remote from the concerns of governmental abuse that gave rise to the fourteenth amend-

ment, *see* 106 S.Ct. at 664–65, the Court held that "[w]here a government official's act causing injury to life, liberty or property is merely negligent, 'no procedure for compensation is *constitutionally* required.'"  *Id.* at 666 (quoting *Parratt*, 451 U.S. at 548, 101 S.Ct. at 1919 (Powell, J., concurring in result)) [emphasis added in original].

sion, at 4–5. Defendants object to that portion of the Recommended Decision, arguing that, although the First Circuit has reserved decision on the question, see Defendants' Memorandum In Opposition, at 3 (citing *Voutour v. Vitale,* 761 F.2d 812 (1st Cir.1985)), most other circuits have ruled that the *Parratt* analysis should be applied to alleged deprivations of liberty interests. *See* Defendants' Memorandum In Opposition, at 2–3 (citing cases).

Every case which has held that *Parratt* applies to deprivations of liberty interests has involved an alleged violation of *procedural* due process. *See, e.g., Wilson v. Beebe,* 770 F.2d 578, 584–85 (6th Cir.1985) (*en banc*) [distinguishing between procedural and substantive due process claims, court holds that *Parratt* applies only to alleged violations of *procedural* due process]; *Thibodeaux v. Bordelon,* 740 F.2d 329, 333 (5th Cir.1984) ["*Parratt* analysis applies only to asserted violations of *procedural* due process; *it does not apply to alleged violations of substantive constitutional proscriptions applicable to the states because of incorporation into the due process clause of the fourteenth amendment.*"]; *Daniels v. Williams,* 720 F.2d 792, 796 n. 3 (4th Cir.1983), *aff'd on other grounds,* 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986).

The distinction between procedural and substantive due process is implicit in the *Parratt* and *Hudson* decisions.

At the outset in *Parratt* the Court notes the narrow scope of the claim at issue:

The only deprivation respondent alleges in his complaint is that "his rights under the Fourteenth Amendment of the Constitution of the United States were violated. That he was deprived of his property and Due Process of Law." App. 8. As such, *respondent's claims differ from the claims which were before us in Monroe v. Pape,* [365 *U.S.* 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961) ], *which involved violations of the Fourth Amendment,* and the claims presented in *Estelle v. Gamble,* 429 U.S. 97 [97 S.Ct. 285, 50 L.Ed.2d 251] (1976), which involved alleged violations of the Eighth Amendment. Both of these Amendments have been held applicable to the States by virtue of the adoption of the Fourteenth Amendment. See *Mapp v. Ohio,* 367 U.S. 643 [81 S.Ct. 1684, 6 L.Ed.2d 1081] (1961); *Robinson v. California,* 370 U.S. 660 [82 S.Ct. 1417, 8 L.Ed.2d 758] (1962). Respondent here refers to no other right, privilege, or immunity secured by the constitution or federal laws other than the Due Process Clause of the Fourteenth Amendment *simpliciter.*

451 U.S. at 536, 101 S.Ct. at 1913 (*emphasis added* ).

In *Hudson,* the Court addressed two issues: whether a prisoner had a fourth amendment right of privacy in his prison cell; and whether an intentional destruction of personal property deprived plaintiff of property without due process of law. Had the Court intended the expansive interpretation of *Parratt* here urged by defendants, the entire fourth amendment discussion in *Hudson* would have been unnecessary, as the presence of an adequate state law remedy would have been dispositive of the federal claim. *See* 104 S.Ct. at 3198–3202; *see also id.* at 3205–07 (O'Connor, J., concurring) [distinguishing between substantive fourth amendment claim and the constitutional right implicated by a guard's destruction of a prisoner's personal property]; *Daniels v. Williams,* 474 U.S. 327, 106 S.Ct. 677, 678, 88 L.Ed.2d 662 (1986) (Stevens, J., concurring in the judgment) [noting that due process clause is source of both substantive and procedural protections, and that presence of state law procedures is relevant only to claims alleging a violation of procedural due process].

The Fifth Circuit has explained the *Parratt*-inspired dichotomy between substantive and procedural due process:

*Parratt* concerns alleged violations of procedural due process: whether a state has provided procedures that adequately protect individuals from arbitrary or erroneous deprivations of life, liberty, or property. An allegation that a state action has violated an individual's right to procedural due process is thus *a con-*

*demnation of the procedures that attended the action and not an assessment of the constitutionality of the action itself.* P. Bator, P. Mishkin, D. Shapiro & H. Wechsler, Hart and Wechsler's *The Federal Courts and the Federal System* 236 (Supp.1981). In such a case "[t]he controlling inquiry is solely whether the State is in a position to provide for predeprivation process." *Hudson,* 468 U.S. at 534, 104 S.Ct. at 3204. The State does not violate procedural due process by failing to provide a procedure it cannot practically provide. In contrast, *when a plaintiff alleges that state action has violated an independent substantive right, he asserts that the action itself is unconstitutional.* If so, his rights are violated no matter what process precedes, accompanies, or follows the unconstitutional action. The availability of notice and a hearing is therefore irrelevant; *Parratt*'s concern with the feasibility of predeprivation process has no place in this context. *See The Supreme Court, 1981 Term,* 96 Harv.L. Rev. 62, 105 (1982).

*Augustine v. Doe,* 740 F.2d 322, 326-27 (5th Cir.1984) [footnote deleted, emphasis added].

The fourth amendment prohibition against unreasonable searches and seizures is made applicable to the states by virtue of the due process clause of the fourteenth amendment. *See Wolf v. Colorado,* 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949). Violations of fourth amendment rights may be redressed pursuant to 42 U.S.C. § 1983. *See Monroe v. Pape,* 365 U.S. 167, 171, 81 S.Ct. 473, 475, 5 L.Ed.2d 492 (1961). Plaintiff alleges violations of "independent substantive" rights by asserting that his arrest and the search of his residence violated the fourth amendment. *See* Complaint, at ¶ 12.

In *Tennessee v. Garner,* 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985), the Supreme Court rejected the argument that, where there is probable cause to justify a search or seizure, the fourth amendment "has nothing to say about *how* that seizure is made," *id.* 105 S.Ct. at 1699:

This submission ignores the many cases in which this Court, by balancing the extent of the intrusion against the need for it, has examined the reasonableness of the manner in which a search or seizure is conducted. To determine the constitutionality of a seizure "[w]e must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *United States v. Place,* 462 U.S. 696, 703, 103 S.Ct. 2637, 2642, 77 L.Ed.2d 110 (1983); ... We have described "the balancing of competing interests" as "the key principle of the Fourth Amendment." *Michigan v. Summers,* 452 U.S. 692, 700, n. 12, 101 S.Ct. 2587, 2593, n. 12, 69 L.Ed.2d 340 (1981). See also *Camara v. Municipal Court,* 387 U.S. 523, 536-537, 87 S.Ct. 1727, 1734-1735, 18 L.Ed.2d 930 (1967). Because one of the factors is the extent of the intrusion, it is plain that reasonableness depends on not only when a seizure is made, but also how it is carried out.

*Id.* (citations omitted).

Ever since *Rochin v. California,* 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952), federal courts have recognized a *substantive due process* right to be "free of police conduct 'brutal' and 'offensive to human dignity.'" *Fernandez v. Leonard,* 784 F.2d 1209, 1214 (1st Cir.1986) [quoting *Rochin,* 342 U.S. at 174, 72 S.Ct. at 210]. In *Fernandez,* the First Circuit acknowledged that the courts have classified this right as both "substantive" and "procedural," but the First Circuit stated, "we think such protection could only be substantive." 784 F.2d at 1215; *see also Thompson v. Olson,* 798 F.2d 552, 558-59 (1st Cir.1986) [discussing whether police misconduct constitutes substantive due process violation]. As the Eighth Circuit stated in reversing a grant of summary judgment in a section 1983 action for police brutality:

Allegations of brutality by law enforcement personnel apprehending a suspect or effecting an arrest are typically analyzed in terms of fourth amendment and liberty interests. If sufficiently egregious, a deliberate use of excessive force

in this context can implicate the substantive fourth amendment guarantee against unreasonable seizures, the substantive due process right to be free from abusive governmental conduct "offensive to human dignity," or both.... Since claims of this nature involving substantive due process are to be considered without regard to whether adequate state tort remedies provide an alternate form of redress, the district court incorrectly entered summary judgment against appellant.

*New v. City of Minneapolis,* 792 F.2d 724, 726 (8th Cir.1986) (citations and footnote omitted).

Thus, even assuming that the First Circuit were disposed to extend *Parratt* to a violation of *procedural* due process resulting in the deprivation of a *liberty* interest, *but see Voutour,* 761 F.2d at 826 (Bownes, J., concurring) ["I do not believe that *Parratt* should be extended beyond deprivations of property"], there is no authority for applying *Parratt* to plaintiff's claims, which assert violations of substantive fourth amendment rights. *See Mann v. City of Tucson,* 782 F.2d 790, 793 (9th Cir.1986) [error to dismiss, under *Parratt,* § 1983 claim of wrongful search and seizure]; *accord Augustine,* 740 F.2d at 325–326; *New,* 792 F.2d at 725–26; *Wilson,* 770 F.2d at 585–86. As the Fifth Circuit has noted, "*Parratt* is irrelevant if the plaintiff alleges a violation of a substantive right protected by the Constitution against infringement by state governments." *Augustine,* 740 F.2d at 327.

## B. *Qualified Immunity*

As an alternative ground for summary judgment, defendants contend that *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), as construed in *Floyd v. Farrell,* 765 F.2d 1 (1st Cir.1985), entitles them to qualified immunity from suit.

Plaintiff objects to the Magistrate's recommendation that summary judgment be granted for defendants on the claims of wrongful arrest and excessive use of force. Defendants object to the recommended denial of their motion for summary judgment on the unlawful search claim.

In *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), the Court modified the doctrine of qualified immunity. Cases prior to. *Harlow* had recognized that the qualified immunity defense had both subjective and objective elements:

The objective element involves a presumptive knowledge of and respect for "basic, unquestioned constitutional rights." *Wood v. Strickland,* 420 U.S. 308, 322, 95 S.Ct. 992, 1001, 43 L.Ed.2d 214 (1975). The subjective component refers to "permissible intentions." *Ibid.* Characteristically the Court has defined these elements by identifying the circumstances in which qualified immunity would *not* be available. Referring both to the objective and subjective elements, we have held that qualified immunity would be defeated if an official *"knew or reasonably should have known* that the action he took within his sphere of official responsibility would violate the constitutional rights of the [plaintiff], *or if* he took the action *with the malicious intention* to cause a deprivation of constitutional rights or other injury...."

457 U.S. at 815, 102 S.Ct. 2736–37 [emphasis in original].

In *Harlow,* however, the Court found that the subjective element of the qualified immunity defense frequently was "incompatible with [the Court's] admonition in *Butz [v. Economou,* 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978)] that insubstantial claims should not proceed to trial," 457 U.S. at 815–16, 102 S.Ct. at 2736–37, because many courts had held that a government official's subjective good faith was a question of fact, to be resolved by a jury. *See id.* at 816 & n. 27, 102 S.Ct. at 2737 & n. 27. After noting the costs attendant upon litigating the subjective good faith of government officials, the Court concluded that it would strike the proper balance between protecting citizens from the excesses of government officials, and protecting government officials from insubstantial claims which are allowed to pro-

ceed toward trial notwithstanding a motion for summary judgment, by removing the subjective component of the qualified immunity defense:

> [W]e conclude today that bare allegations of malice should not suffice to subject government officials either to the costs of trial or to the burdens of broad-reaching discovery. We therefore hold that government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. See *Procunier v. Navarette*, 434 U.S. 555, 565, 98 S.Ct. 855, 861, 55 L.Ed.2d 24 (1978); *Wood v. Strickland*, 420 U.S. at 322, 95 S.Ct. at 1000.
>
> Reliance on the objective reasonableness of an official's conduct, as measured by reference to clearly established law, should avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment. *On summary judgment, the judge appropriately may determine, not only the currently applicable law, but whether that law was clearly established at the time an action occurred.* If the law at that time was not clearly established, an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to "know" that the law forbade conduct not previously identified as unlawful. Until this threshold immunity question is resolved, discovery should not be allowed. *If the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct.* Nevertheless, if the official pleading the defense claims extraordinary circumstances and can prove that he neither knew nor should have known of the relevant legal standard, the defense should be sustained. But again, the defense would turn primarily on objective factors.

> By defining the limits of qualified immunity essentially in objective terms, we provide no license to lawless conduct. The public interest in deterrence of unlawful conduct and in compensation of victims remains protected by a test that focuses on the objective legal reasonableness of an official's acts. Where an official could be expected to know that certain conduct would violate statutory or constitutional rights, he should be made to hesitate; and a person who suffers injury caused by such conduct may have a cause of action. But where an official's duties legitimately require action in which clearly established rights are not implicated, the public interest may be better served by action taken "with independence and without fear of consequences." *Pierson v. Ray*, 386 U.S. 547, 554, 87 S.Ct. 1213, 1218, 18 L.Ed.2d 288 (1967).

*Harlow*, 457 U.S. at 817–19, 102 S.Ct. at 2738 (footnotes omitted, emphasis added).

The First Circuit applied the *Harlow* standard to a police officer's claim of qualified immunity in *Floyd v. Farrell*, 765 F.2d 1 (1st Cir.1985). In *Floyd*, the plaintiff alleged that the police violated his civil rights by subjecting him to a warrantless arrest without probable cause. The district court denied the defendant police officer's motion for summary judgment because "[t]he question of qualified immunity is almost universally one which presents a question of fact...." 765 F.2d at 2 (quoting district court). The First Circuit reversed. In its discussion of the qualified immunity rule laid down in *Harlow*, for purposes of its application in the context of wrongful arrest as presented in *Floyd*, the First Circuit stated:

> We have applied the *Harlow* test to police arrests, *Briggs v. Malley*, 748 F.2d 715 (1st Cir.1984), and have held that seeking an arrest warrant is "objectively reasonable" so long as the presence of probable cause is at least arguable. *Id.* at 719. An officer will be held liable for seeking an arrest warrant later found to be without probable cause only if there *clearly* was no probable cause at the time the warrant was requested. *Id.*

*We think this rule can be extended to warrantless arrests as well, keeping in mind that probable cause for a warrantless arrest may be different than probable cause for the issuance of an arrest warrant.* Despite a finding of no probable cause at a later hearing, a police officer should not be found liable under § 1983 for a warrantless arrest because the presence of probable cause was merely questionable at the time of the arrest. *His qualified immunity is pierced only if there clearly was no probable cause at the time the arrest was made.*

765 F.2d at 5 (emphasis added). Thus, where plaintiff had been arrested for receiving stolen property, *Floyd* stated that "[i]f the facts could reasonably have led [defendant] to the conclusion that [plaintiff] knew the car was stolen, then he would have reasonably believed that there was possible [sic] cause to arrest [plaintiff]. Under the *Harlow* standard, this would be sufficient to allow [defendant] to assert the defense of qualified immunity." *Id.* Viewing the facts most favorably to plaintiff, the *Floyd* court concluded that summary judgment should have been granted for defendant:

> The *Harlow* standard requires that we make an objective analysis of the reasonableness of conduct in light of the facts actually known to the officer and not consider the individual officer's subjective assessment of those facts. Nor are actual motives for conduct to be considered in evaluating a qualified immunity defense. It was to prevent such inquiries that the Supreme Court eliminated from the test for qualified immunity consideration of "permissible intentions." *Harlow,* 457 U.S. at 815–19, 102 S.Ct. at 2736–39, ...

We conclude, therefore, that [defendant] is immune from any § 1983 liability arising out of the arrest of [plaintiff]. Summary judgment should have been granted. The district court erred when it stated "the issue of qualified immunity is almost universally one which presents a question of fact to be determined by the trier of fact." The adoption of a purely

objective test in *Harlow* was meant to facilitate the resolution of questions of qualified immunity by summary judgment. As here, the availability of the defense will often turn upon questions which can be resolved as a matter of law. Factual disputes will result in the denial of summary judgment only when they are relevant to the qualified immunity defense and district courts must carefully review the facts before them in light of the *Harlow* standard before denying summary judgment.

765 F.2d at 6.

Defendants assert that the threshold question is whether their conduct was "clearly unconstitutional": "In terms of Fourth Amendment analysis, the question becomes one of the Plaintiff establishing a 'clearly' illegal or unreasonable search ... Defendants contend that facts on record are sufficient to permit the court to conclude that the search was not 'clearly' illegal." Defendants' Memorandum In Objection, at 6. Plaintiff counters with the contention that the Magistrate improperly made factual determinations which are for the jury to make.

The Supreme Court recently has considered the application of qualified immunity in the context of an alleged violation of fourth amendment rights by a law enforcement officer. *See Anderson v. Creighton,* —— U.S. ——, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). In 1983, defendant Anderson and other state and federal officers conducted a warrantless search of the Creighton residence, believing that a fugitive might be hiding in the residence. The Creightons sued Anderson for violation of their fourth amendment rights and demanded money damages pursuant to *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). Anderson moved to dismiss on the ground that he was protected from personal liability for damages under the doctrine of qualified immunity. Prior to any discovery, the district court granted the motion, finding that the undisputed facts established that Anderson had probable cause for the

search, and that exigent circumstances justified the failure to obtain a warrant.

The Eighth Circuit reversed. After reviewing the record, the court found that there were disputed facts material to the issues of probable cause and exigent circumstances. *See Creighton v. City of St. Paul*, 766 F.2d 1269, 1273–77 (8th Cir.1985). The court held that Anderson did not enjoy qualified immunity. because "the Creightons' fourth amendment rights and the 'exigent circumstances' doctrine were 'clearly established' on [the date of the search]." *Id.* at 1277.

Anderson appealed, arguing that "he was entitled to summary judgment on qualified immunity grounds if he could establish as a matter of law that a reasonable officer could have believed the search to be lawful." *Anderson*, — U.S. at —, 107 S.Ct. at 3038.

The Supreme Court agreed with Anderson and reversed. Citing *Harlow*, the Court noted that qualified immunity "generally turns on the 'objective legal reasonableness' of the action ... assessed in light of the legal rules that were 'clearly established' at the time it was taken." *Id.* — U.S. at —, 107 S.Ct. at 3038. "Clearly established" means something more than a general declaration of the legal right allegedly violated:

"The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, ... but it is to say that in the light of preexisting law the unlawfulness must be apparent."

*Id.* (citations omitted).

In *Anderson*, the Court considered for the first time how the qualified immunity standard laid down in *Harlow* is to apply in the context of an alleged fourth amendment violation of "clearly established" law:

It simply does not follow immediately from the conclusion that it was firmly established that warrantless searches not supported by probable cause and exigent circumstances violate the Fourth Amendment that Anderson's search was objectively legally unreasonable. We have recognized that *it is inevitable that law enforcement officials will in some cases reasonably\ but mistakenly conclude that probable cause is present, and we have indicated that in such cases those officials—like other officials who act in ways they reasonably believe to be lawful—should not be held personally liable.* The same is true of their conclusions regarding exigent circumstances.

— U.S. at —, 107 S.Ct. at 3039, 55 U.S.L.W. at 5093 [citations omitted, *emphasis added*]. The Court recognized that "the determination whether it was objectively legally reasonable to conclude that a given search was supported by probable cause or exigent circumstances will often require *examination of the information possessed by the searching officials.*" *Id.* (*emphasis added*). Inquiry into the information possessed by searching officials does not, however, require examination of the subjective intent of those officials:

The relevant question in this case, for example, is the *objective* (*albeit fact-specific*) question whether a reasonable officer could have believed Anderson's warrantless search to be lawful, in light of clearly established law and the information the searching officers possessed. Anderson's subjective beliefs about the search are irrelevant.

The principles of qualified immunity that we reaffirm today require that Anderson be permitted to argue that he is entitled to summary judgment on the ground that, in light of the clearly established principles governing warrantless searches, he could, as a matter of law, reasonably have believed that the search of the Creightons' home was lawful.

*Id.* (*emphasis added*, footnote deleted).

Pursuant to *Anderson*, a two-step analysis is necessary to assess a claim of qualified immunity. First, the court must consider the more general question of whether the law establishing the right allegedly violated was "clearly established" at the time

the challenged action was taken.[8] If the law was clearly established, the court must proceed to consider whether, in the specific circumstances of the challenged action, a "reasonable officer" could have believed that the challenged action was lawful in light of the information possessed by the officers. *See* — U.S. ——, 107 S.Ct. at 3040.

Qualified immunity is an affirmative defense which must be pleaded and proved by defendants. *See Harlow,* 457 U.S. at 815, 102 S.Ct. at 2736. Thus, to win summary judgment on the ground of qualified immunity, defendants must establish *either* that the law establishing the right allegedly violated was not clearly established, *or* that, in light of the facts and circumstances known to these officers, and the clearly established law, a "reasonable" police officer could have believed that the challenged action was lawful.

The first step in the qualified immunity analysis is foreclosed to defendants at this point in the proceedings. At no time have the defendants argued that the law governing plaintiff's fourth amendment rights was not clearly established in February 1983. By 1983, there could be no doubt that plaintiff had a clearly established right to be free (1) from arrest without probable cause, (2) from arrest through use of excessive force, and (3) from an unreasonable search. *See, e.g., Hall v. Ochs,* 817 F.2d 920, 925 (1st Cir.1987) [right to be free from wrongful arrest, and use of excessive force, well established in 1980]; *Fernandez*

*v. Leonard,* 784 F.2d 1209, 1214 (1st Cir. 1986) [right to be free from use of excessive force well established in 1976]; *Donta v. Hooper,* 774 F.2d 716, 719–20 (6th Cir. 1985) [scope of plain view doctrine and limits on police search authority well established in 1978]. Thus, defendants are entitled to summary judgment on the ground of qualified immunity only if, in light of the facts known to the officers at the time of their actions and the clearly established law governing those actions, a "reasonable" police officer could have believed the actions lawful.

Although the parties have submitted statements of material facts, supported by discovery materials,[9] their disparate views as to the law of qualified immunity, and the recent advent of *Anderson,* make it advisable to require supplementation of the record, as follows:

1. Within 20 days of entry of this order, defendants shall submit a comprehensive statement of the material facts, as to which defendants contend there is no dispute, relating to their claims of qualified immunity from suit for wrongful arrest, for use of excessive force, and for wrongful search, arising out of the events of February 3, 1983. Pursuant to *Anderson,* the statement of facts shall set forth *all facts* relevant to the arrest of the plaintiff and the search of his residence, focusing on the *objective* facts *known* to defendants, *not* the subjective thoughts or intentions of the defendants. As the present record reflects that other

---

**8.** The Court cites *Malley v. Briggs,* 475 U.S. 335, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986), in support of the statement that the Court has recognized "that it is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present...." However, *Malley* did not involve a law enforcement officer's determination of whether probable cause existed to justify a search or an arrest. In *Malley,* the Court held that a police officer who executes an arrest warrant will be liable under the same circumstances in which suppression of evidence would be appropriate; that is, in circumstances in which a "reasonably well-trained officer would have known that the [arrest] was illegal despite the magistrate's authorization." 106 S.Ct. at 1098 (quoting *United States v. Leon,* 468 U.S. 897, 922 n. 23, 104 S.Ct. 3405, 3420 n. 23, 82

L.Ed.2d 677 (1984)). As *Malley* involved the intervening factor of a magistrate's authorization, it was not clear from *Malley* by what standard a claim of immunity for a warrantless arrest or search should be evaluated. *See Anderson,* — U.S. at ——, 107 S.Ct. at 3051 (Stevens, J., dissenting) ["Neither (*Malley* nor *Mitchell v. Forsyth,* 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985)), supports the proposition that a warrantless search should be evaluated under a standard less strict than the constitutional standard of reasonableness."]

**9.** Substantial discovery was undertaken by the parties in this case prior to the submission of their motions for summary judgment. *But see Harlow,* 457 U.S. at 817–19, 102 S.Ct. at 2738–39.

law enforcement personnel were involved in the pre-arrest and pre-search activities in this case, the statement of facts shall identify and treat with all facts and circumstances known to *each* law enforcement officer who was in any way, directly or indirectly, involved in or knowledgeable about the "loss" of the badge, the "finding" of the badge by plaintiff, plaintiff's interest in the business premises known as "Automotive Complete," plaintiff's communications with any law enforcement personnel concerning the loss or return of the "badge," or the broken windows, and the nature, timing and execution of the decision to send these defendants to plaintiff's residence to obtain the badge. With regard to all law enforcement personnel, in addition to the facts known to such personnel, the statement shall set forth how and when each officer acquired such facts.

2. Within 10 days after the filing of defendants' statement of facts, plaintiff shall file a statement of facts as to which there is a factual dispute, and any additional facts which plaintiff contends are relevant to the qualified immunity issue.

3. For the convenience of the parties and the court, the statements of facts shall be complete, and shall repeat, rather than incorporate by reference, all facts alleged in previous submissions. All facts shall be supported by appropriate citations to competent evidence in the record, *see* Local Rule 19(b)(1), (2); Fed. R.Civ.P. 56(e), and copies of record material relied on shall be supplied to the court if such material is not contained in the record presently before the court.

4. Within 20 days after plaintiff files his statement of facts, the parties simultaneously shall brief the qualified immunity issue as defined in *Anderson*, in light of the clearly established law and the facts and circumstances of this case.

### III. CONCLUSION

For the foregoing reasons, the court *ACCEPTS* the Magistrate's Recommended Decision in part and *DENIES* defendants' motion for summary judgment on the ground of *Parratt v. Taylor*, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981). The court reserves decision on defendants' motion for summary judgment on the ground of qualified immunity, and for partial summary judgment on the question of punitive damages, pending supplementation of the record as directed by this order.

SO ORDERED.