John F. MAGUIRE, Plaintiff,

v.

MUNICIPALITY OF OLD ORCHARD BEACH, et al., Defendants.

Civ. No. 91-0095-P-C.

United States District Court, D. Maine.

Feb. 18, 1992.

Cynthia Dill, Thompson, McNaboe, Ashley & Bull, Portland, Me., for plaintiff.

Edward Benjamin, Preti, Flaherty, Beliveau & Pachios, Daniel Rapaport, Portland, Me., for defendants.

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

GENE CARTER, Chief Judge.

This case involves an action brought against individual Defendant police officers (hereinafter "individual Defendants") and their employer, the Town of Old Orchard Beach (hereinafter "the Municipality"), arising from several incidents involving Plaintiff John F. Maguire between October 23, 1988 and October 29, 1988. Plaintiff alleges common law causes of action under the Maine Tort Claims Act (hereinafter "MTCA") and violations of the federal and state constitutions.[1] With respect to federal constitutional violations, Plaintiff alleges violations of constitutional rights under the First, Fourth, Fifth, Eighth, and Fourteenth Amendments and brings his cause of action under 42 U.S.C. section 1983.[2]

---

1. Plaintiff asserts that Defendants violated his rights under Article I of the Constitution of the State of Maine, namely, section 1 ("Natural Rights"), section 5 ("Unreasonable searches prohibited"), section 6–A ("discrimination against persons prohibited"), and section 9 ("cruel or unusual punishments prohibited").

2. Plaintiff filed a complaint in state court against Defendants on February 27, 1991. The action was removed to this Court on March 12, 1991.

The Court now has before it Defendants' Motion for Summary Judgment, filed on September 24, 1991. The Court acts on the motion on the basis of the written submissions of the parties. For the reasons that follow, the Court will grant in part and deny in part Defendants' Motion for Summary Judgment.

## I. *Summary Judgment*

A motion for summary judgment must be granted if:

> [T]he pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c). The Court of Appeals for the First Circuit has articulated the legal standard to be applied in deciding motions for summary judgment:

> [T]he movant must adumbrate 'an absence of evidence to support the nonmoving party's case.' *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 [106 S.Ct. 2548, 2554, 91 L.Ed.2d 265] (1986). When that is accomplished, the burden shifts to the opponent to establish the existence of a fact issue which is both 'material,' in that it might affect the outcome of the litigation, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 [106 S.Ct. 2505, 2510, 91 L.Ed.2d 202] (1986); *Hahn v. Sargent*, 523 F.2d 461, 464 (1st Cir.1975), *cert. denied*, 425 U.S. 904 [96 S.Ct. 1495, 47 L.Ed.2d 754] (1976), and 'genuine,' in that a reasonable jury could, on the basis of the pro-offered proof, return a verdict for the opponent. *Anderson*, 477 U.S. at 248 [106 S.Ct. at 2510]; *Oliver v. Digital Equipment Corp.*, 846 F.2d 103, 105 (1st Cir.1988). It is settled that the nonmovant may not rest upon mere allegations, but must adduce specific, provable facts demonstrating that there is a triable issue. 'The evidence illustrating the factual controversy cannot be conjectural or problematic; it must have substance in the sense that it limns differing versions of the truth which a factfinder must resolve at an ensuing trial.' *Mack v. Great Atlantic and Pacific Tea Co.*, 871 F.2d 179, 181 (1st Cir.1989). As the Supreme Court has said:

> [T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be entered.

> *Anderson*, 477 U.S. at 249–59, 106 S.Ct. at 2510–16.

*Brennan v. Hendrigan*, 888 F.2d 189, 191–92 (1st Cir.1989).

The Court now looks to the supporting papers on the motions and the citations to materials of evidentiary quality in support of the issues which the Court must consider as a basis for its action upon the motion.

## II. *Facts*

On October 23, 1988, Plaintiff, while driving, was stopped by Officer Norman Gendron of the Old Orchard Beach Police Department (hereinafter "Police Department"). Plaintiff appeared to Officer Gendron to be disoriented at the time.[3] Officer Gendron radioed the Old Orchard Beach rescue unit for assistance. The rescue unit arrived at the scene shortly thereafter and Officers Allen Holmes and Danny Bruns arrived as back-up at the same time.

Plaintiff was taken from his car, restrained, and placed on a stretcher. He was then taken by rescue personnel in an ambulance to Southern Maine Medical Center (hereinafter "Medical Center") in Biddeford, Maine for immediate evaluation. After evaluation by a physician in the emergency room at the Medical Center, the medical staff determined that Plaintiff posed a likelihood of serious harm due to mental illness and was certified for emergency involuntary admission to the Augusta Mental Health Institute (hereinafter "AMHI"). That decision was authorized by the approval of the application for emergency involuntary admission to a mental hospital by a Justice of the Peace.

---

**3.** According to Plaintiff, "[w]hile on Saco Avenue, I became disoriented and stopped my car alongside of the road." *See* Plaintiff's Statement, Affidavit of John Maguire (hereinafter "Maguire Affidavit"), ¶ 2.

Plaintiff's vehicle was towed from the scene by the A–1 Towing Company of Old Orchard Beach to its holding yard. In checking the ownership and registration of the vehicle driven by Plaintiff at the time of the stop, Officer Gendron found Certificate of Title and Transfer of Title documents from the State of New Hampshire.[4] Because Officer Gendron believed that the vehicle might be stolen, he directed personnel of A–1 Towing Company not to release the vehicle to anyone unless they could show documentation proving their ownership of the car.[5]

After Plaintiff was discharged from AMHI on October 25, 1988, he returned home, where he learned that his car had been towed to A–1 Towing. He went with a friend, William Schofield, to the towing yard. An employee of the A–1 Towing Company allowed him to take the car.[6] After the release of the vehicle, the owner of the towing company called the Police Department to inform it that the car had been released without any proof of ownership.

Officer Gendron accompanied an A–1 tow truck to Plaintiff's house. The vehicle was located in front of Plaintiff's house. The A–1 Towing Company tow truck towed Plaintiff's vehicle back to its holding yard until Plaintiff provided ownership documents.[7] The police did not have a warrant for the seizure of Plaintiff's vehicle.

Plaintiff later learned that his car had been towed by the A–1 Towing Company. He went to the Police Department and demanded the return of his vehicle. The police refused to return it to Plaintiff. The record shows, without dispute that, while at the police station, Officer Danny Bruns removed his night stick from his belt, placed it near Plaintiff's head, and threatened Plaintiff with physical harm if he mentioned the towing incident to anyone. Officer Bruns stated to Plaintiff, "I am going to put knots in your head if you say anything to anybody."

On October 29, 1988, Officers Keith Grandy and Todd Nadeau were dispatched to Plaintiff's home, along with Raymond Veir, the driver of an ambulance. The officers had been advised by Amy Levasseur, a social worker at the Bureau of Mental Health and Retardation, that Plaintiff had conveyed to her threats to take action against Old Orchard Beach police officers. Upon arriving at Plaintiff's house, Officer Grandy knocked on the door. Plaintiff opened the door slightly and asked what the officers wanted and whether they had a

---

**4.** The only documents in the record regarding car registration and title are those submitted by Defendants as Exhibits A–D attached to the Affidavit of Norman Gendron (hereinafter "Gendron Affidavit"). The documents in this regard first contain a Certificate of Title dated October 9, 1984, issued to Jean Helen Carmichael. Gendron Affidavit, Exhibit A. The Title was then assigned by Ms. Carmichael on February 19, 1986 to King Chevrolet–Oldsmobile, which reassigned the Title to Hawk Auto Sales of North Hampton on July 2, 1986. In turn, Hawk Auto Sales reassigned the Title to Seacoast Wholesale on July 10, 1986. *Id.* Exhibit B suggests that the most recent owner of the vehicle was William H. Schofield, based on the Assignment of Title wherein Seacoast Wholesale certified that "title to the motor vehicle described above was transferred to" William Schofield on October 19, 1988. Gendron Affidavit, Exhibit B.

**5.** The parties dispute whether any documents pertaining to Plaintiff were located in the glove compartment. According to Plaintiff, he believed that "the current title reflecting Maguire's ownership was in the glove compartment at the time of [my] arrest." Plaintiff's Amended State-

ment of Controverted Facts (hereinafter "Plaintiff's Statement"), ¶ 8. Defendants state that "[n]one of the documents contained any reference to Plaintiff." Defendants' Statement of Uncontroverted Facts (hereinafter "Defendants' Statement"), ¶ 8.

**6.** Plaintiff states that "[a]t all times herein concerned Plaintiff's car, a 1979 Blue Chevrolet Impala, was duly registered in the State of New Hampshire in Plaintiff's brothers [sic] name, William Maguire." Plaintiff's Statement, ¶ 7.

**7.** Parties dispute whether Gendron first sought to inform Plaintiff that his vehicle was to be towed. According to Plaintiff, he returned home with his car and later, when he went outside with William Schofield, the car was missing from the parking lot. Plaintiff's Statement, ¶ 9. He added that he "was never notified by the police of the reasons why they took [my] car and the police did not knock on Plaintiff's door prior to seizing the car." *Id.*, ¶ 11. Defendants state that Officer Gendron repeatedly knocked on Plaintiff's door but received no response. Defendants' Statement, ¶ 14.

warrant. The officers responded that they did not have a warrant.[8]

Once Officer Grandy and Raymond Veir were inside Plaintiff's house, they noticed that Plaintiff was on the telephone.[9] Mr. Veir then spoke on the telephone with someone involved with Plaintiff's mental health care.[10] Upon hanging up, Mr. Veir advised Officers Grandy and Nadeau that Plaintiff was to be brought to the Medical Center for an immediate psychiatric evaluation in the emergency room. At the time of the call, the officers were not aware of the caller's specific identity. Officer Grandy stated that he knew from Mr. Veir, however, that the person who had directed this action was involved in Plaintiff's mental health care.

The officers then took Plaintiff from his home to the ambulance where they laid him face down on the ambulance gurney. Mr. Veir used a roll of gauze material to fashion restraints to secure Plaintiff to the gurney. Mr. Veir and the police officers placed the gurney into the ambulance.[11] Officer Nadeau rode in the ambulance to the Medical Center.

The Medical Center's Emergency Department Record stated that Plaintiff was "brought in by police;" that he was "accompanied by 3 OOB policemen." The Record also noted that Plaintiff's legs and arms were restrained,[12] and that he was "transported for evaluation [regarding] making homocidal [sic] threats to OOB P.D." Defendants' Statement, Exhibit 8.[13] He was discharged from the Medical Center and admitted to Togus Veterans' Hospital (hereinafter "Togus") as an emergency involuntary commitment on the same night. After "several days of adequate self-control," Plaintiff was discharged from Togus on November 2, 1988.

Several months after his discharge, Plaintiff sought medical treatment at the Osteopathic Hospital of Maine and at Togus for recurring neck pain, which he attributed to the aforementioned incident of October 29, 1988. *See* Exhibits C–D.

### III. Qualified Immunity under Section 1983

#### A. Standard

Defendants have raised qualified immunity as an affirmative defense to Plaintiff's section 1983 action. *See* Defendants' Answer to Plaintiff's Complaint, at 5; Defendants' Memorandum of Law in Support of Motion for Summary Judgment on Issue of Qualified Immunity (hereinafter "Defendants' Memorandum") at 7. In actions brought under 42 U.S.C. section 1983, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly estab-

---

**8.** At this point, the parties dispute what happened next. According to Plaintiff, he "then shut the door and went inside to call for help. The officers then forcibly entered Plaintiff's home ..." Plaintiff's Statement, ¶ 15. Defendants state that "Plaintiff came out of his house, then walked back into it, leaving the door to his house open. Because Officer Grandy did not wish Plaintiff to leave his sight under the circumstances, he followed Plaintiff into his house. Raymond Veir ... accompanied Officer Grandy inside the home." Defendants' Statement, ¶ 17.

**9.** The parties dispute whether Plaintiff was calling someone on the telephone, *see* Plaintiff's Statement, ¶ 15, or whether the telephone rang and Plaintiff answered it, *see* Defendants' Statement, ¶ 18. They also dispute whether Plaintiff handed the telephone to Mr. Veir, *see* Defendants' Statement, ¶ 18, or whether the telephone was grabbed from Plaintiff's hand, *see* Plaintiff's Statement, ¶ 15.

**10.** It is unclear from the record with whom Mr. Veir spoke. Amy Levasseur could not recall whether she spoke with either Officer Grandy or

Raymond Veir at Plaintiff's house. *See* Deposition of Amy Levasseur, at p. 54, lines 6–13.

**11.** Parties dispute some of the facts surrounding Plaintiff's seizure from his home and delivery to the ambulance. Plaintiff alleges that he was handcuffed and shackled, and that the officers used excessive force in restraining him, tying him face down to the gurney and throwing him into the ambulance. Plaintiff's Statement, ¶ 16. Defendants state that the officers "each took one of Plaintiff's arms and walked him to the ambulance." Defendants' Statement, ¶ 19. They then "assisted Plaintiff in lying face down on the ambulance gurney." *Id.*

**12.** One medical record stated that Plaintiff was "restrained at legs and 3rd strap on stretcher" and was "lying face down." Defendants' Statement, Exhibit 7.

**13.** Plaintiff denies making any homicidal threats while at the Medical Center. *See id.,* ¶ 20.

lished statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982).[14] *See also Fonte v. Collins,* 713 F.Supp. 511, 514 (D.Me.1989), *aff'd,* 898 F.2d 284 (1st Cir.1990); *Vitalone v. Curran,* 665 F.Supp. 964, 971 (D.Me.1987); *Tauvar v. Bar Harbor Congregation of Jehovah's Witnesses, Inc.,* 633 F.Supp. 741, 748 (D.Me.1985), *aff'd,* 787 F.2d 579 (1st Cir.1986), *cert. denied,* 479 U.S. 1038, 107 S.Ct. 894, 93 L.Ed.2d 846 (1987). The First Circuit noted that "[u]nder this standard, the reasonableness of the official conduct is not measured against the official's *actual* knowledge of constitutional standards and the probable constitutionality of his or her action, but rather against a relatively uniform level of 'presumptive knowledge' of constitutional standards." *Floyd v. Farrell,* 765 F.2d 1, 4–5 (1st Cir.1985).[15] Hence, qualified immunity "does not protect reckless, plainly incompetent, or knowing violators of the law ... but it offers a haven to many other state actors." *Brennan v. Hendrigan,* 888 F.2d 189, 192 (1st Cir.1989).

This Court has delineated the *Harlow* standard as follows:

> [A] two-step analysis is necessary to assess a claim of qualified immunity. First the court must consider the more general question of whether the law establishing the right allegedly violated was "clearly established" at the time the challenged action was taken. If the law was clearly established, the court must proceed to consider whether, in the specific circumstances of the challenged action, a "reasonable officer" could have believed that the challenged action was lawful in light of the information possessed by the officers.

*Vitalone,* 665 F.Supp. at 973–74. The Court concluded that:

> [T]o win summary judgment on the ground of qualified immunity, defendants must establish *either* that the law establishing the right allegedly violated was not clearly established, *or* that, in light of the facts and circumstances known to these officers, and the clearly established law, a "reasonable" police officer could have believed that the challenged action was lawful.

*Id.* at 974.

The Supreme Court sought to clarify the murky contours of what connotes a "clearly established statutory or constitutional right" in *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987):

> The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful ... but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

*Id.* *See also Fonte v. Collins,* 898 F.2d 284, 285 (1st Cir.1990). Thus, " 'clearly established' " means something more than a general declaration of the legal right allegedly violated." *Vitalone,* 665 F.Supp. at 973. With respect to *Anderson's* refinement of the standard, the First Circuit noted that "a court must determine whether an alleged right was established with sufficient particularity that a reasonable official could anticipate that his actions would violate that right." *Borucki v. Ryan,* 827 F.2d 836, 838 (1st Cir.1987). As noted, however, in a leading treatise:

> [N]othing in *Anderson* addresses the question of the proper frame of reference for evaluating whether the law is clearly established. In *Harlow,* the Court explicitly refrained from defining

---

**14.** As noted by the *Harlow* Court: "Reliance on the objective reasonableness of an official's conduct, as measured by reference to clearly established law, should avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment." *Id.* 457 U.S. at 818, 102 S.Ct. at 2738.

**15.** The *Floyd* court also noted:

The *Harlow* standard requires that we make an objective analysis of the reasonableness of conduct in light of the facts actually known to the officer and not consider the individual officer's subjective assessment of those facts. Nor are actual motives for conduct to be considered in evaluating a qualified immunity defense. *Id.* at 6.

"the circumstances under which 'the state of the law' should be evaluated by reference to the opinions of this Court, of the Courts of Appeals, or of the local District Courts." Nothing in the Court's subsequent decisions has shed any further light on the question.

In the absence of definitive guidance from the Supreme Court, the lower federal courts have had to struggle on their own with this difficult issue.

Cook, J. & Sobieski, J., 1 *Civil Rights Actions*, at 2–78.41, ¶ 206[B]. The Sixth Circuit provided a helpful framework for the "proper frame of reference" in *Ohio Civil Service Employees Association v. Seiter*, 858 F.2d 1171, 1177 (6th Cir.1988): "[I]n the ordinary instance, to find a clearly established constitutional right, a district court must find binding precedent by the Supreme Court, its court of appeals or itself." *Id.*

In this regard, the First Circuit has delineated certain "clearly established" constitutional rights in the context of qualified immunity. *See, e.g., Amsden v. Moran*, 904 F.2d 748, 752 (1st Cir.1990) ("Where persons are deprived of property interests, it has long been 'clearly established' that due process safeguards must be afforded."), *cert. denied,* —— U.S. ——, 111 S.Ct. 713, 112 L.Ed.2d 702 (1991); *Brennan*, 888 F.2d at 193 ("The fourth amendment reaches stops and detentions short of arrest.... Yet, not every contact by a police officer implicates constitutional rights...: Where an individual is detained, the fourth amendment is more deeply implicated. Nevertheless, the constitutional guarantee is violated only if the detention is unreasonable."); *Hall v. Ochs*, 817 F.2d 920, 925 (1st Cir. 1987) ("The right to be free from unreasonable seizures of the person was ... well established by 1980 ...");[16] *Fernandez v. Leonard*, 784 F.2d 1209, 1214 (1st Cir.1986) (right to be free from use of excessive force well established in 1976).[17]

The First Circuit has upheld qualified immunity as a matter of law where defendant police officers acted in an objectively reasonable manner in the context of a clearly established constitutional or statutory right. *See, e.g., Malachowski v. City of Keene*, 787 F.2d 704, 714 (1st Cir.) ("[Defendant police officer] acted well within the scope of the powers expressly granted him under applicable New Hampshire statutes."), *cert. denied,* 479 U.S. 828, 107 S.Ct. 107, 93 L.Ed.2d 56 (1986);[18] *Floyd*, 765 F.2d at 5 ("[A]nother officer, standing in [defendant]'s shoes and having the same information [defendant] had, would reasonably have come to the conclusion that he

---

**16.** The Supreme Court noted in *Brown v. Texas*, 443 U.S. 47, 50–51, 99 S.Ct. 2637, 2640, 61 L.Ed.2d 357 (1979):

The reasonableness of seizures that are less intrusive than a traditional arrest ... depends 'on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers' ... Consideration of the constitutionality of such seizures involves a weighing of the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty.

*Id.* (citations omitted). The Court added that: [T]he Fourth Amendment requires that a seizure must be based on specific, objective facts indicating that society's legitimate interests require the seizure of the particular individual, or that the seizure must be carried out pursuant to a plan embodying explicit, neutral limitations on the conduct of individual officers.

*Id.* at 51, 99 S.Ct. at 2640.

**17.** The Supreme Court noted that:

With respect to a claim of excessive force, the same standard of reasonableness at the moment applies: 'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers,' ... violates the Fourth Amendment. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.

*Graham v. Connor*, 490 U.S. 386, 396–97, 109 S.Ct. 1865, 1872, 104 L.Ed.2d 443 (1989).

**18.** The *Malachowski* court also noted that:

Although [defendant] entered [plaintiff]s' residence without a warrant and without consent in order to make the arrest, N.H.R.S.A. 594:10(I)(a) expressly permits a police officer to make an arrest for an offense committed in his presence, as [defendant] did here.... As a matter of law, therefore, [defendant] acted in objective good faith, according to New Hampshire statutes, when he entered [plaintiff]s' residence to take Amy into custody. *Id.*

had probable cause to arrest [plaintiff] ...."); *Cf. Prokey v. Watkins*, 942 F.2d 67, 73 (1st Cir.1991) ("[I]f what the policeman knew prior to the arrest is genuinely in dispute, and if a reasonable officer's perception of probable cause would differ depending on the correct version, that factual dispute must be resolved by a fact finder."); *Cinelli v. Cutillo*, 896 F.2d 650, 655 (1st Cir.1990) ("A reasonable police officer should have known that it would be a violation of a defendant's constitutional rights to denigrate the role of his lawyer and attempt, in the lawyer's absence, to coerce a defendant into cooperating with the police."). *Fonte*, 713 F.Supp. at 516 (It was not "objectively reasonable for Defendants to believe Plaintiff was committing a violation of section 303(1)(A) ....").

### B. Plaintiff's Claims

Plaintiff alleges in his Complaint and subsequent pleadings three distinct incidents in which Defendants violated his constitutional or statutory rights. *See* Complaint, ¶¶ 12–13, 14–15, 17–19.[19] First, Defendant Gendron allegedly seized Plaintiff's automobile from his residence without a warrant or other authority. Second, Defendant Bruns allegedly removed his night stick from his belt, placed it near Plaintiff's head and threatened him with physical harm if Plaintiff protested any further about the taking of his car. Lastly, Defendant Grandy allegedly wrongfully seized Plaintiff from his residence, manacled him at his hands and feet, placed him in a restraining jacket, threw him face down on a stretcher, and transported him to the Medical Center.

The Court will now evaluate each of these allegations in light of the *Harlow* and *Anderson* standards to determine whether Defendants are entitled to qualified immunity.[20]

19. Plaintiff originally alleged that he was wrongfully seized by Old Orchard Beach police officers and transported to the Medical Center on October 23, 1988. *See* Complaint, ¶ 5–6. He did not, however, raise this allegation as one of the incidents for which Defendants are precluded from qualified immunity in his Memorandum in Opposition to Defendants [sic] Motion for Summary Judgment (hereinafter "Plaintiff's Memorandum"). The Court, therefore, will not address this allegation.

With respect to Plaintiff's initial seizure by police officers, the Court notes, however, that Officer Gendron's conduct in seizing Plaintiff and transporting him to the Medical Center for psychiatric evaluation falls within Maine law under Title 34–B M.R.S.A. section 3862. Gendron's decision to transport Plaintiff for such evaluation was "based upon his personal observation," and, hence, entitles him to qualified immunity in this action.

Based on the record, Officer Allen Holmes's, one of the named individual Defendants, only involvement in these alleged incidents was the initial incident on October 23, 1988. He arrived as "back-up" during the initial seizure of Plaintiff at that time. *See* Defendants' Statement, ¶ 4. Therefore, the Court will grant summary judgment on his behalf.

20. Plaintiff alleges violations of the First, Fourth, Fifth, Eighth and Fourteenth Amendments of the United States Constitution under his section 1983 claim. The Court finds that the First Amendment is not implicated in any of these three incidents and, therefore, dismisses alleged violations of this amendment. The Court notes that Plaintiff raised the Article I sections of the Maine Constitution that correspond to those amendments that he raised under the United States Constitution, except that he did not raise section 4 ("freedom of speech and publication"), which would roughly correspond to the First Amendment.

With respect to Plaintiff's allegations regarding violation of the Fifth and Fourteenth Amendments, the United States Supreme Court has held that the "guarantee of due process has been applied to *deliberate* decisions of government officials to deprive a person of life, liberty, or property." *Daniels v. Williams*, 474 U.S. 327, 331, 106 S.Ct. 662, 665, 88 L.Ed.2d 662 (1986) (emphasis in original). The plaintiff must instead establish "some heightened level of culpability such as an 'affirmative abuse of power,' or 'deliberate' misconduct." *Darling v. Augusta Mental Health Institute*, 535 A.2d 421, 431 n. 11 (Me.1987) (quoting *Daniels*, 474 U.S. at 330–31, 106 S.Ct. at 664–65) (citations omitted)). *See also Davidson v. Cannon*, 474 U.S. 344, 347–48, 106 S.Ct. 668, 670, 88 L.Ed.2d 677 (1986).

The First Circuit has interpreted these Supreme Court cases as "requiring on a section 1983 claim a showing that the defendant acted with 'reckless or deliberate indifference' to the due process rights of the plaintiff." *Darling*, 535 A.2d at 431 n. 11 (citing *Williams v. City of Boston*, 784 F.2d 430, 434 (1st Cir.1986)). Similarly, the Supreme Court noted that the plaintiff must show that the defendant acted with "deliberate indifference" to the plaintiff's situation to establish an Eighth Amendment claim of cruel and unusual punishment under section 1983. *See Estelle v. Gamble*, 429 U.S. 97, 105, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976).

The Court finds that, where Defendants are not entitled to qualified immunity, it cannot

### 1. *Seizure of Automobile*

■ The United States Constitution provides Plaintiff with "clearly established" rights to be protected from unreasonable seizures under the Fourth Amendment and from deprivation of property without due process of law under the Fifth and Fourteenth Amendments. *See, e.g., Amsden,* 904 F.2d at 752. At the very least, then, Defendant is not automatically entitled to qualified immunity on the basis that no "clearly established" constitutional right is at issue regarding the seizure of the vehicle from Plaintiff's residence on October 25, 1988.

The Court finds that genuine issues of material fact exist with respect to whether the seizure was unreasonable that preclude a finding that Defendants are entitled to qualified immunity.[21] The record reveals a dispute over genuine issues of material fact regarding the seizure of the automobile from Plaintiff's residence. Captain Kelley of the Police Department stated to Plaintiff's original attorney in this case, Zbigniew J. Kurlanski, that "the Officers should not have taken the car from Mr. Maguire's home because those Officers had no authority to take the car." Plaintiff's Memorandum, Exhibit A, Affidavit of Zbigniew J. Kurlanski, Esquire, ¶ 4.

Plaintiff argues that Defendant Gendron unlawfully seized his vehicle:

> Any 'suspicions' that Officer Gendron allegedly had that the car was stolen were unfounded and unreasonable. The car was registered under the name Maguire,

there were documents in the glove compartment reflecting that the car was registered under the name Maguire, there were no exigent circumstances involved since the car had already been impounded for at least 2 days while Plaintiff was in the hospital during which time a check on the status of the vehicle could have been made.

*Id.* at 9. Although Plaintiff refers to the vehicle as "my car," he avers that the car was duly registered in the name of his brother, William Maguire. Plaintiff avers that among the various documents in the glove compartment was an Application for Certification of Title Form signed by William Maguire, listing "Seacoast Wholesale" as the seller of the vehicle. Maguire Affidavit, ¶ 8. The record before the Court does not contain any documents regarding the registration of the car under the name of Maguire.[22] In the absence of any documentation showing that the car was owned by Plaintiff, Defendant Gendron could reasonably conclude that the vehicle might be stolen. Pursuant to 29 M.R.S.A. § 2501:

> Whenever a motor vehicle is being operated by a person not having upon his person or in the vehicle the registration certificate covering that vehicle, or if it be operated by a person other than the person in whose name it is registered and the operator is unable to present reasonable evidence of his authority to operate that vehicle, the law enforcement officer, or any other law enforcement officer, may impound that vehicle and hold it

conclude as a matter of law on the record before it, that Plaintiff has met this standard for his due process and Eighth Amendment claims as they relate to each of the alleged incidents. The Court finds that genuine issues of material fact exist as to whether Defendants acted toward Plaintiff with "reckless or deliberate indifference." As a result, the fact finder must make this determination.

**21.** Neither party has raised the issue of whether Plaintiff has standing to object to the seizure of a vehicle under either the Fourth or Fifth Amendment. The record does not establish the true ownership of the vehicle in question. The issue of ownership, then, is a matter for the fact finder to resolve.

According to the record before the Court, it appears that William Schofield is the vehicle's

owner, based upon the Affidavit of Norman Gendron, Exhibit B, Assignment of Title dated October 19, 1988. If Schofield is the true owner and if Plaintiff is a bailee of Schofield, Plaintiff would have standing, at least under the Fourth Amendment, to bring action against Defendants. "[I]f the owner of a vehicle has turned it over to another person for some period of time, then surely this latter person has standing vis-a-vis the car during the duration of the bailment." 4 Wayne R. LaFave, *Search and Seizure* ¶ 11.3(e), at 334 (2d ed. 1987).

But, as noted above, based on the record before it, the Court cannot determine the ownership of the car; it is a genuine issue of material fact that must be decided by the fact finder.

**22.** *See supra* note 3.

until that vehicle is claimed and taken by the registered owner thereof, who shall be forthwith notified of the impounding, or until the registered owner verifies the authority of the operator to so operate. Thus, at the very least, Defendant Gendron appropriately acted pursuant to Maine law in having the vehicle originally impounded and in instructing the A–1 Towing Company to release the vehicle only upon proof of ownership. There is no evidence in the record, however, that Defendant Gendron ever notified William Schofield of the impounding, or of Schofield verifying the authority of Plaintiff to operate the car.

Beyond the initial impounding of the vehicle, however, genuine issues of fact exist that must be resolved by the fact finder regarding whether Officer Gendron's subsequent actions were reasonable. Specifically, genuine issues of material fact exist as to what transpired when Plaintiff and William Schofield went to A–1 Towing and retrieved the car. Defendant Gendron's instructions to personnel of A–1 Towing Company were that they were "not to release the vehicle to anyone unless they could show documentation proving their ownership." Defendants' Statement, ¶ 8. If Schofield were the owner of the car, then the towing company acted appropriately in returning the car and Defendant Gendron may have wrongfully reimpounded the vehicle. According to Defendants, however, "the owner of the A–1 Towing Company called the Police Department on October 25, 1988, indicating that the car had been mistakenly released without any proof of ownership being shown." Defendants' Statement, ¶ 14.[23] In light of the genuine issues of fact regarding the seizure of the vehicle, the Court cannot conclude as a matter of law that Defendant Gendron is entitled to qualified immunity as a defense. Accordingly, the Court will not grant summary judgment to Defendant Gendron on the basis of qualified immunity with respect to the second seizure of the vehicle.

### 2. Interaction at Old Orchard Beach Police Department

▮ Plaintiff alleges that he went to the Police Department and demanded the return of his vehicle but Officer Danny Bruns refused to comply with this demand. Plaintiff alleges that Officer Bruns "removed his night stick from his belt and threatened Plaintiff with physical harm if he protested about the fact that the police wrongfully towed Plaintiff's car." Plaintiff's Amended Statement, ¶ 14. Defendants do not dispute these allegations and the Court will accept them as true.

The Court concludes, however, that the actions of Officer Bruns did not impinge on any clearly established constitutional or statutory right. The First Circuit has noted that "[f]ear or emotional injury which results solely from verbal harassment or idle threats [by police officers] is generally not sufficient to constitute an invasion of an identified liberty interest." *Pittsley v. Warish*, 927 F.2d 3, 7 (1st Cir.1991). Similarly, other courts have held that verbal harassment and threats do not establish a constitutional violation. *See, e.g., Emmons v. McLaughlin*, 874 F.2d 351, 353 (6th Cir. 1989) (threats causing plaintiff to fear for his life not an infringement of a constitutional right, and thus not actionable under section 1983); *Collins v. Cundy*, 603 F.2d 825, 827 (10th Cir.1979) (allegations that sheriff laughed at prisoner and threatened to hang him not sufficient to establish a constitutional deprivation under section 1983); *Bibbo v. Mulhern*, 621 F.Supp. 1018, 1025 (D.Mass.1985) ("[V]erbal abuse ... in the station house, falling short of physical force as it did, was not the kind of conduct for which due process clause provides redress, and instead a remedy must be sought under state tort law.").

Similarly, the Court finds here that no clearly established constitutional or statutory right has been implicated by Defendant Bruns' alleged conduct under section 1983. Accordingly, the Court concludes that Defendant Bruns is entitled to quali-

---

**23.** The Court also notes that genuine issues of material fact exist regarding the seizure of the vehicle from Plaintiff's residence. Specifically, Defendants state that they knocked on Plaintiff's door at his residence before seizing the vehicle. Plaintiff states that the police did not knock on his door prior to seizing the car. *See* Plaintiff's Amended Statement, ¶ 11.

fied immunity under section 1983, and, thus, the Court grants summary judgment in his favor regarding Plaintiff's federal claim.

### 3. *Seizure of Plaintiff from his Residence*

■ Plaintiff alleges that, on October 29, 1988, he was wrongfully seized from his home by Defendant Grandy. Defendants argue that Defendant Grandy is entitled to qualified immunity under section 1983.

The Court concludes, for purposes of the motion, that Plaintiff was subjected to a seizure by Defendant Grandy and that he has a "clearly established" constitutional right under the Fourth Amendment to be free of unreasonable seizures by the police. *See, e.g., Brennan,* 888 F.2d at 193; *Hall,* 817 F.2d at 925; *Fernandez,* 784 F.2d at 1214. On this record, the Court concludes, for purposes of the motion, that Plaintiff's seizure was unreasonable in that the authority for such seizure was not grounded in any existing Maine statute and, similarly, that, in light of the clearly established constitutional right and the information available to Gendron, his conduct was not "objectively reasonable." Hence, Defendant Grandy is not entitled to qualified immunity for the seizure of Plaintiff from his home on October 29, 1988.

· Specifically, the two relevant Maine statutes reveal that Defendant's conduct was not reasonable. First, title 34–B M.R.S.A. section 3862 provides:

If a law enforcement officer has reasonable grounds to believe, based upon his personal observation, that a person may be mentally ill and that due to his condition, he presents a threat of imminent and substantial physical harm, he may take the person into protective custody.

Defendant Grandy neither asserts that he took Plaintiff into protective custody nor that he seized Plaintiff on the basis of his personal observation. Rather, he argues that he merely assisted in transporting Plaintiff to the Medical Center, based upon the advice of medical personnel. In effect, Defendant argues that title 34–B M.R.S.A.

section 3862 does not apply to the seizure of Plaintiff from his home.

Rather, as authority for his conduct, Defendant cites to title 34–B M.R.S.A. section 3863, which states:

Any ... law enforcement officer ... may make a written application to admit a person to a mental hospital..... The written application shall be accompanied by a dated certificate, signed by a licensed physician or a licensed clinical psychologist.... The application and accompanying certificate shall be reviewed by a Justice of the Superior Court, Judge of the District Court, Judge of Probate or a complaint justice.... Upon endorsement of the application and certificate by the judge or justice, any ... law enforcement officer ... may take the person into custody and transport him to the hospital designated in the application.

The record does not show, however, that Defendant complied with *any* of the specific steps of this statutory procedure. For example, no written application was made to admit Plaintiff to the Medical Center before he was seized by Defendant Grandy. Defendant cannot legitimately use this Maine law as a basis for his conduct in seizing Plaintiff. Similarly, Defendant failed to comply with the other relevant Maine statute, 34–B M.R.S.A. section 3862.

Accordingly, the Court finds that Defendant's conduct violates the two-part *Harlow* standard for qualified immunity, and that Defendant is not entitled to qualified immunity for the seizure of Plaintiff from his home. The Court, therefore, will deny summary judgment on behalf of Defendant Grandy in this regard.

### IV. *Discretionary Immunity under Maine Law*

In addition to his cause of action under section 1983, Plaintiff alleges that Defendants are liable for damages under the MTCA, 14 M.R.S.A. section 8101 *et seq.* Plaintiff alleges that, under Maine law, he is "entitled to be compensated for his injuries since the actions of the Defendants were intentional and imposed harm" on him. Plaintiff's Memorandum at 16.[24] De-

---

24. As an example, Plaintiff alleges that Defendant officer Bruns intentionally inflicted harm upon him in violation of the law. Plaintiff's Memorandum at 10.

fendants argue that both the Municipality and individual Defendants are immune from civil liability under the MTCA, based upon 14 M.R.S.A. section 8111(1)(C).[25] *See* Defendants' Memorandum at 18.

---

**25.** This section of the MTCA reads in relevant part:

1. Immunity. Notwithstanding any liability that may have existed at common law, employees of governmental entities shall be absolutely immune from personal civil liability for the following:

. . . . .

C. Performing or failing to perform any discretionary function or duty, whether or not the discretion is abused; and whether or not any statute, charter, ordinance, order, resolution, rule or resolve under which the discretionary function or duty is performed is valid.

The absolute immunity provided by paragraph C shall be applicable whenever a discretionary act is reasonably encompassed by the duties of the governmental employee in question, regardless of whether the exercise of discretion is specifically authorized by statute, charter, ordinance, order, resolution, rule or resolve and shall be available to all governmental employees ... who are required to exercise judgment or discretion in performing their official duties.

14 M.R.S.A. § 8111(1) (Supp.1991).

**26.** The Maine Law Court has adopted four factors in determining whether a governmental action constitutes a discretionary function:

(1) Does the challenged act, omission, or decision necessarily involve a basic governmental policy, program or objective? (2) Is the questioned act, omission, or decision essential to the realization or accomplishment of that policy, program, or objective as opposed to one which would not change the course or direction of the policy, program, or objective? (3) Does the act, omission, or decision require the exercise of basic policy evaluation, judgment, and expertise on the part of the governmental agency involved? (4) Does the governmental agency involved possess the requisite constitutional, statutory, or lawful authority and duty to do or make the challenged act, omission, or decision?

*Polley v. Atwell,* 581 A.2d 410, 413 (Me.1990). The Law Court also noted that "[w]hether allegedly wrongful conduct is a 'discretionary function' depends upon the actual conduct at issue and its relationship to the performance of some legislatively imposed duty." *Clark v. Maine Medical Center,* 559 A.2d 358, 360 (Me.1989). The *Restatement (Second) of Torts* section 895D comment b (1979) describes the purpose of the discretionary function immunity as follows:

The basis of the immunity has been not so much a desire to protect an erring officer as it has been a recognition of the need of preserv-

■ Neither party disputes that Defendants' conduct at issue constituted a discretionary function.[26] The Court finds that Defendant Gendron's conduct in impounding Plaintiff's vehicle and Defendant Grandy's conduct in seizing Plaintiff from his residence [27] fall within the contours of dis-

ing independence of action without deterrence or intimidation by the fear of personal liability and vexatious suits.... [T]ort liability should not be imposed for conduct of a type for which the imposition of liability would substantially impair the effective performance of a discretionary function.

535 A.2d at 425.

The Law Court has addressed whether certain police actions are ministerial or discretionary. *See, e.g., Leach v. Betters,* 599 A.2d 424 (Me. 1991) ("The parties agree that a police officer performs a discretionary function ... when making a warrantless arrest."); *Moore v. Lewiston,* 596 A.2d 612, 616 (Me.1991) ("[O]fficers were exercising a discretionary function because they were required to use their judgment while acting in furtherance of a departmental policy restricting the use of police vehicles to transport private citizens."); *Kane v. Anderson,* 509 A.2d 656, 657 (Me.1986) ("[T]he execution of an arrest warrant is a ministerial rather than a discretionary function."). In opinions unrelated to police actions, the Law Court noted that the responsibilities and functions pertaining to the involuntary commitment process are discretionary. *See Taylor v. Herst,* 537 A.2d 1163, 1165 (Me.1988) (initial admission procedures in 34 M.R.S.A. section 2333); *Darling,* 535 A.2d at 428 (post-admission procedures in 34 M.R.S.A. section 2372).

**27.** Plaintiff also alleges that Defendants violated title 15 M.R.S.A. section 704 ("Arrests without warrant; liability"). Pursuant to Maine law, there are four elements to an arrest in Maine:

(1) an intention on the part of the arresting officer presently to make an arrest; (2) a communication of that intention to the prospective arrestee; (3) an understanding of that intention by said prospective arrestee; and (4) 'the actual or constructive seizure or detention of the person to be arrested by the one [officer] having the present power to control him.'

*State v. Griffin,* 459 A.2d 1086, 1092 (Me.1983) (quoting *State v. Daley,* 411 A.2d 410, 411 (Me. 1980) (quoting *State v. Powers,* 386 A.2d 721, 727 (Me.1978))). Here, Defendant Grandy's seizure of Plaintiff fails to satisfy all four elements of an arrest. Although Plaintiff claims that he was "falsely arrested," Complaint, ¶ 23, there is no evidence in the record that Officer Grandy communicated to Plaintiff any intention to arrest him.

The Court finds that the seizure of Plaintiff by Defendant Grandy does not fall within section 704 because the seizure was not an arrest under

cretionary functions as construed by the Law Court.

This Court has noted that the Law Court has held that "the discretionary function exception to the MTCA, section 8111(1)(C), provides no shield from liability for a police officer's intentional harm to another." *Springer v. Seaman,* 658 F.Supp. 1502, 1511 (D.Me.1987) (citing *MacKerron v. Madura,* 474 A.2d 166, 167 (Me.1984)), *aff'd in part and rev'd in part on other grounds,* 821 F.2d 871 (1st Cir.1987). The Law Court, however, later clarified its *MacKerron* holding:

> *MacKerron* does not stand for the proposition that discretionary immunity is unavailable in any case in which the plaintiff alleges an intentional tort, rather than a negligent act or omission. In *MacKerron,* a police officer had intentionally interfered with the relationship between an attorney and client. We determined in those circumstances, the officer was not entitled to discretionary immunity. Our focus on the "intentional" nature of the conduct was illustrative, not definitive. The rationale of the decision was not grounded on the plaintiff's allegation of an intentional tort, but rather, on the fact that the defendant's egregious conduct clearly exceeded, as a matter of law, the *scope* of any discretion he could have possessed in his official capacity as a police officer and therefore was not encompassed within the immunity provision of 14 M.R.S.A. § 8111(1)(C).

*Polley,* 581 A.2d at 413–14. Here, the facts regarding Defendants Gendron and Grandy are easily distinguishable from those in *MacKerron.* Even if Defendants' conduct is shown to be deliberately indifferent or reckless, the Court cannot conclude, for purposes of this Motion for Summary Judgment, that such conduct "clearly exceeded, as a matter of law, the *scope* of any discretion [they] could have possessed in [their] official capacity as police officer[s]." Therefore, the Court finds that Defendants Gendron and Grandy are entitled to discretionary immunity under the MTCA and it will grant summary judgment

Maine law. Therefore, the Court dismisses as a matter of law Plaintiff's claim under title 15

on behalf of individual Defendants Gendron and Grandy regarding claims under the MTCA.

With respect to Defendant Bruns, however, although the Court has found that Officer Bruns is entitled to qualified immunity under section 1983, Plaintiff may still seek a remedy under state tort law, if appropriate. *See Bibbo,* 621 F.Supp. at 1025. The Court finds that Bruns' threatening behavior toward Plaintiff "clearly exceeded, as a matter of law, the scope of any discretion he could have possessed in his official capacity as a police officer." Such conduct does not fall within the immunity provision of title 14 M.R.S.A. section 8111(1)(C), and, therefore, the Court will deny summary judgment on behalf of Defendant Bruns under the MTCA.

### V. *Municipal Liability*

Plaintiff brings his cause of action against individual Defendant police officers and against the Municipality of Old Orchard Beach. The United States Supreme Court has held that municipalities may be sued under section 1983:

> Local governing bodies, therefore, can be sued directly under § 1983 for monetary ... relief where, as here, the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers. Moreover, although the touchstone of the § 1983 action against a government body is an allegation that official policy is responsible for a deprivation of rights protected by the Constitution, local governments, like every other § 1983 "person," by the very terms of the statute, may be sued for constitutional deprivations visited pursuant to governmental "custom" even though such a custom has not received formal approval through the body's official decisionmaking channels.

*Monell v. Department of Social Services,* 436 U.S. 658, 690–91, 98 S.Ct. 2018, 2035–

M.R.S.A. section 704.

36, 56 L.Ed.2d 611 (1978) (footnote omitted).[28] *See also Blackburn v. Snow,* 771 F.2d 556, 571 (1st Cir.1985). *Cf. Elliott v. Cheshire County,* 940 F.2d 7, 12 (1st Cir. 1991) ("[T]he evidence is insufficient to create a triable issue of fact as to whether the county had a policy amounting to deliberate indifference to potential suicides among its inmate population, whether implemented by inadequately training its officers, or by maintaining an unsafe jail."). In light of *Monell,* the First Circuit has held that, in order to prevail on a claim of municipal liability under 42 U.S.C. section 1983, a plaintiff must "establish both that (1) there existed a municipal custom or policy of deliberate indifference [29] to the commission of constitutional violations by police officers;[30] and (2) this custom or policy was the cause of, and moving force behind, the particular constitutional deprivation of which he was complaining."[31] *Foley,* 948 F.2d at 14.

Defendants argue that Plaintiff has failed to state a claim for municipal liability under section 1983.[32] With respect to such liability, Plaintiff argues:

> Without *any* of the discovery that was requested, namely, histories of the officers named as Defendants, copies of training manuals, and information pertaining to similar complaints filed against the municipality, it is impossible at this time for the Plaintiff, pursuant to F.R.C.P. 56(e) to present by affidavit facts supporting this allegation.

Plaintiff's Memorandum at 17.

Courts have held that "where the plaintiff fails to state a claim, he is not entitled to discovery merely to find out whether or not there is a factual basis for his claim." *Cuddy v. Boston,* 765 F.Supp. 775, 778 (D.Mass.1991) ("Because the plaintiff fails to allege facts sufficient to state a claim of municipal liability under § 1983, the plain-

---

**28.** The *Monell* Court concluded:

> [I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983.

436 U.S. at 694, 98 S.Ct. at 2037–38.

**29.** The United States Supreme Court adopted the "deliberate indifference" standard for section 1983 "failure to train" claims. *See Canton v. Harris,* 489 U.S. 378, 388 n. 8, 109 S.Ct. 1197, 1204, 103 L.Ed.2d 412 (1989). The First Circuit has subsequently applied that standard to such claims. *See, e.g., Voutour v. Vitale,* 761 F.2d 812, 820 (1st Cir.1985) ("[W]e believe that significantly more than simple negligence in police training is necessary for municipal liability under section 1983. Like most other courts which have addressed the matter, we hold that the supervisor must demonstrate at least gross negligence amounting to deliberate indifference . . ."), *cert. denied,* 474 U.S. 1100, 106 S.Ct. 879, 88 L.Ed.2d 916 (1986); *Bordanaro v. McLeod,* 871 F.2d 1151, 1158 (1st Cir.) ("The City was also found liable under § 1983 for having a policy of inadequate recruitment, training, supervision or discipline of its police officers. The jury found that this policy evidenced gross negligence amounting to deliberate indifference to the constitutional rights of those with whom the police would come into contact."), *cert. denied,* 493 U.S. 820, 110 S.Ct. 75, 107 L.Ed.2d 42 (1989). In *Foley v. Lowell,* however, the First Circuit cites to the *Bordanaro* case as authority for its seeming expansion of the application of the "deliberate indifference" standard to section

1983 claims that do not involve "failure to train" allegations. 948 F.2d 10, 14 (1st Cir.1991).

**30.** The First Circuit earlier elaborated on this first requirement when it stated that the custom or practice "must be so well-settled and widespread that the policymaking officials of the municipality can be said to have either actual or constructive knowledge of it yet did nothing to end the practice." *Bordanaro,* 871 F.2d at 1156.

**31.** The First Circuit earlier noted that: "Holding the city liable only if the injury results from an officially sanctioned policy or custom, exempts the municipality from responsibility for the aberrant and unpredictable behavior of its employees while making it liable for acts and conduct rightly attributable to the city." *Bordanaro,* 871 F.2d at 1155. With respect to this second requirement for municipal liability, the First Circuit also noted that "[t]here must be some 'affirmative link' between the municipal custom and the constitutional deprivation." *Id.* at 1157.

**32.** Defendants argue that "Plaintiff has failed to even allege conduct constituting 'deliberate indifference' to Plaintiff's rights sufficient to support a claim of municipal liability under Section 1983." Defendants' Memorandum of Law at 18. In light of *Foley,* the Court agrees that Defendants have correctly construed the proper standard to apply to a municipal liability claim under section 1983 although, as noted above, the *Foley* reading of this standard seems broader than the Supreme Court originally delineated in *Canton.*

tiff's request for discovery is denied ...") (citing *Kadar Corp. v. Milbury*, 549 F.2d 230, 233 (1st Cir.1977); *MacKnight v. Leonard Morse Hospital*, 828 F.2d 48, 51 (1st Cir.1987)). Similarly, the First Circuit has held that "a court may grant summary judgment despite an opposing party's claim that discovery would yield additional facts where the opposing party has not alleged specific facts that could be developed through discovery." *Taylor v. Gallagher*, 737 F.2d 134, 137 (1st Cir.1984). In *Taylor*, the court noted that the plaintiff had not shown, through a Rule 56(f) affidavit or otherwise, "how discovery could have breathed life into his claim." *Id.*

Here, Plaintiff has failed to allege even the barest allegations of municipal liability under section 1983 in his Complaint. *See* Complaint. For instance, he makes no mention of any official policy or custom of the Police Department, or of its "deliberate indifference" to the rights of others, such as Plaintiff. Plaintiff has no entitlement to discovery in the absence of allegations of the fundamental elements of a liability claim. The Complaint's failure to allege necessary predicate factors in respect to municipal liability is fatal to the claim. The Court agrees with Defendants that "Plaintiff should not be allowed to conduct a 'fishing expedition' of discovery against Defendants ..." *See* Defendants' Motion in Opposition to Plaintiff's Motion for Continuance of Trial and Other Relief at 2. Therefore, the Court will grant summary judgment in favor of the Municipality on Plaintiff's section 1983 claim against the Municipality.

The Court, however, will deny summary judgment regarding the Municipality's immunity under the MTCA. The Court has found that the individual Defendants are entitled to discretionary immunity from personal civil liability under section 8111(1)(C) of the MTCA. The determination of municipal immunity under the MTCA, however, is an independent and separate inquiry. Section 8103(1) of the MTCA states in relevant part: "Except as otherwise expressly provided by statute, all governmental entities shall be immune from suit on any and all tort claims seeking recovery of damages." 14 M.R.S.A. § 8103(1) (1980).[33]

Under Maine law, 14 M.R.S.A. section 8116, a municipality will waive immunity in those substantive areas in which it has procured liability insurance.[34] The Court finds that, pursuant to Maine law under *Moore*, 596 A.2d at 615, the Municipality has failed to meet its burden under title 14 M.R.S.A. section 8116 in showing that it did not have liability insurance that would cover Plaintiff's claim. *See* Defendants' Statement of Uncontroverted Facts, ¶ 29; Affidavit of Pamela Cheeseman (hereinafter "Cheeseman Affidavit"). In her Affidavit, Pamela Cheeseman avers that the Municipality's "Risk Pool is set up to pool funds from participating municipalities to provide payments of up to $300,000 per occurrence for liabilities and obligations imposed under the [MTCA]." Cheeseman Affidavit, ¶ 3. Cheeseman further avers that "[b]y becoming a participant in the Maine Municipal Association Risk Pool, a municipality does not obtain insurance for liabilities and obligations imposed by the [MTCA]." *Id.*, ¶ 5.

---

**33.** This case does not fit within any of the exceptions to immunity enumerated in section 8104 of the MTCA, which includes "property damage, bodily injury, or death arising from ownership, maintenance, or use of vehicles, machinery, or equipment; from construction, operation, or maintenance of public buildings; from accidental discharge of pollutants; or from construction, cleaning, or repair of roads and the like." *See Moore*, 596 A.2d at 614–15 n. 5.

**34.** Section 8116 of the MTCA states in pertinent part:
> The legislative or executive body or any department of the State or any political subdivision may procure insurance against liability for any claim against it or its employees for which immunity is waived under this chapter or under any other law.... If the insurance provides coverage in areas where the governmental entity is immune, the governmental entity shall be liable in those substantive areas but only to the limits of the insurance coverage.
>
> . . . . .
>
> A governmental entity or a public self-funded pool, which self-insures against the obligations and liabilities imposed by this Act, shall designate funds set aside to meet such obligations and liabilities as self-insurance funds.

14 M.R.S.A. § 8116 (Supp.1991).

Nonetheless, the Municipality has not met its burden in proving that it did not waive immunity under title 14 M.R.S.A. section 8116. The Court finds that the fact finder must determine whether the "Risk Pool" is a type of "liability insurance" as envisioned under the MTCA and, therefore, the Court will not grant summary judgment on behalf of the Municipality under the MTCA.

### VI. *Conclusion*

In sum, with respect to Officers Norman Gendron and Chuck Grandy, the Court finds that their qualified immunity defense under section 1983 must fail and, therefore, the Court will DENY Defendants' Motion for Summary Judgment on their behalf. The Court does find, however, that Officers Gendron and Grandy are entitled to discretionary immunity under the MTCA and will GRANT Defendants' Motion for Summary Judgment with respect to such immunity.

With respect to Officer Danny Bruns, the Court finds that he is entitled to qualified immunity under section 1983 and will GRANT summary judgment on his behalf with respect to such immunity. The Court also finds, however, that Officer Bruns is not entitled to discretionary immunity under the MTCA and will DENY summary judgment in his favor under the MTCA.

With respect to Officers Patrick Donnelly [35] and Allen Holmes, the Court finds that they are immune from suit under both section 1983 and the MTCA and, therefore, the Court will GRANT Defendants' Motion for Summary Judgment in their favor.

With respect to the Municipality of Old Orchard Beach, the Court finds that the Municipality is entitled to immunity under section 1983 and, therefore, the Court will GRANT summary judgment in its favor. The Court further finds, however, that the Municipality's immunity defense must fail under the MTCA and, therefore, the Court will DENY Defendants' Motion for Summary Judgment on behalf of the Municipality under the MTCA.

Accordingly, it is hereby ORDERED that Defendant's Motion for Summary Judgment be, and it is hereby, DENIED in part and GRANTED in part as specifically stated above.

---

**35.** The record contains no mention of Defendant Officer Patrick Donnelly's involvement in any of the alleged incidents. As the First Circuit noted in *Kostka v. Hogg*, 560 F.2d 37 (1st Cir.1977), regarding section 1983 claims, "only persons who were directly involved in the wrongdoing may be held liable." *Id.* at 40. Here, there is no evidence whatsoever that Officer Donnelly was involved, directly or indirectly, in the alleged wrongdoing.