John M. **HEGARTY**, as Personal Representative of the Estate of Katherine A. Hegarty, and Individually, Plaintiff,

v.

**SOMERSET COUNTY**, John R. Atwood, Andrew E. Demers, Jr., Spencer Havey, Gary Wright, Rene Guay, Wilfred Hines, Thomas Giroux, Jr., and William Crawford, Jr., Defendants.

Civ. No. 93–0004B.

United States District Court, D. Maine.

March 23, 1994.

Julian L. Sweet, Berman & Simmons, P.A., Lewiston, ME, for plaintiff.

George Z. Singal, Gross, Minsky, Mogul & Singal, P.A., Bangor, ME, for defendants Atwood & Demers.

Frederick J. Badger Jr., Richardson & Troubh, Bangor, ME, for defendant Wright.

William R. Fisher, Monaghan, Leahy, Hochadel & Libby, Portland, ME, for remaining defendants.

### ORDER AND MEMORANDUM OF DECISION

BRODY, District Judge.

Shortly after midnight on May 16, 1992, Katherine Hegarty was shot and killed in her home by police officers attempting to execute a warrantless entry and arrest. Her husband, John Hegarty, both individually and on behalf of his wife's estate, brings this action against the officers involved in the incident, county and state supervisory personnel, and Somerset County. He claims, pursuant to 42 U.S.C. § 1983, that Defendants deprived him and his wife of their rights under the Fourth and Fourteenth Amendments of the United States Constitution. He also brings a number of pendant state claims under the Maine Civil Rights Act, 5 M.R.S.A. §§ 4681–4685 (Supp.1993), and the Maine Tort Claims Act, 14 M.R.S.A. §§ 8101–8118 (1980 & Supp. 1993).

Defendants move for summary judgment on all counts.[1] They assert that they are

---

1. Defendants Atwood and Demers move to dismiss Plaintiff's state claims pursuant to Fed. R.Civ.P. 12(b)(6) for failure to state a claim upon which relief could be granted. Because Defen-

dants presented materials outside the pleadings, the Court treats this motion as one for summary judgment. See Fed.R.Civ.P. 12(b) ("If, on a motion asserting the defense numbered (6) to dis-

entitled to summary judgment on Plaintiff's claims under § 1983· and the Maine Civil Rights Act because of qualified immunity. They further contend that discretionary immunity bars Plaintiff's recovery on his state claims.

The Court finds that Defendants Atwood, Demers, Havey, and Somerset County are immune from suit on Plaintiff's § 1983 and Maine Civil Rights Act claims on the basis of qualified immunity; but that Defendants Wright, Guay, Hines, Crawford, and Giroux are not. The Court also finds that all Defendants except Somerset County are immune from suit on Plaintiff's state tort claims on the basis of discretionary immunity.

### I. Standard

██ On a motion for summary judgment, the Court "reads the record and indulge[s] in all inferences in a light most favorable to the nonmoving party." *Levy v. FDIC*, 7 F.3d 1054, 1056 (1st Cir.1993) (quoting *Rivera–Ruiz v. Gonzalez–Rivera*, 983 F.2d 332, 333–34 (1st Cir.1993)). To succeed on a motion for summary judgment, "the moving party must show that there is an absence of evidence to support the nonmoving party's position." *Febus Rodriguez v. Betancourt–Lebron*, 14 F.3d 87, 91 (1st Cir. 1994). If the moving party accomplishes this, the burden shifts to the nonmoving party to show that there is an issue of fact that could affect the outcome of the litigation and from which a reasonable jury could find for the nonmoving party.· *Id.*

### II. Facts

The facts when viewed in the light most favorable to the nonmoving party, Plaintiff, are as follows: John and Katherine Hegarty were residents of the Jackman, Maine area since 1973. (Hegarty Aff. ¶ 3.) Katherine

Hegarty was a Registered Maine Guide, (Hegarty Aff. ¶ 4), and was known for her marksmanship (Giroux Aff. ¶ 11). ·The couple owned a cabin in the Jackman area that was located on a dirt road about three miles from the nearest paved road, Route 201. (Giroux Dep. at 53–54.) About a mile and a half toward Route 201 from the Hegarty cabin there was a cable strung between two pillars, barring passage onto the road. (Hegarty Aff. ¶ 13.)

On the morning of May 15, 1992, four campers let themselves through the gate and proceeded to an area near the Hegarty cabin. (Pl.'s Ex. C9 at 1.) They set up a campsite roughly 75 yards from the cabin. (Pl.'s Ex. C8 at 1.) The campers left to go fishing and returned to the campsite at about 8:00 p.m. (Pl.'s Ex. C9 at 1.) They noticed Katherine Hegarty's truck near the cabin and saw her doing yard work. (Pl.'s Ex. C8 at 3.) Hegarty did not speak to the campers at that time. (*Id.*) Sometime around 9:00 p.m., Hegarty confronted the campers asking who gave them the key for the gate. (Pl.'s Ex. C9 at 1.) The campers believed Hegarty was either intoxicated or mentally unstable. (*Id.*) Hegarty told the campers, among other things, "this is my house and you're invading my privacy." (Pl.'s Ex. C8 at 4.)

After another verbal exchange, the campers told Hegarty that they would leave in the morning. (*Id.*) Hegarty responded, "[o]nly if you make it 'til the morning." (Pl.'s Ex. C10 at 3.) Hegarty went into the cabin and retrieved a gun, and then, from her porch, fired a number of shots in the air in the vicinity of the campers.[2] Hegarty went back into the cabin a number of times; the campers believed that she was reloading her gun.[3] (Pl.'s Ex. C8 at 5.) One of the campers asked Hegarty if they could leave, and He-

---

miss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56...").

**2.** The record is not clear how close the bullets came to the campers. (Pl.'s Ex. C10 at 3 (10 or 15 feet above their heads) and Pl.'s Ex. C8 at 5 (gun was pointed in general direction of campers but they could not hear bullets whistling near-

by)). Nor is it clear whether Hegarty was actually aiming at them. (Pl.'s Ex. C8 at 5–6 ("I think she was trying ... to scare us.... I don't believe it was aimed directly at us") and Pl.'s Ex. C11 at 3 ("I don't know if she was trying to hit us or not, I have no idea.").)

**3.** It is not clear how many shots Hegarty fired but the campers estimated about thirty shots. (Pl.'s Ex. C9 at 1.)

garty responded that she would follow them to see how they got through the gate. (Pl.'s Ex. C8 at 6.) During one of Hegarty's trips into her cabin, the campers got into their truck and drove away quickly. (Pl.'s Ex. C10 at 4.) As the campers passed Hegarty's cabin, they saw her come out with a gun but they are unsure whether she fired any shots. (*Id.*) The campers believed that Hegarty followed them part way down the dirt road. (*Id.*)

The campers went to a truck stop located four or five miles from the Hearty cabin and contacted the police. (Pl.'s Ex. C11 at 4.) Reserve Deputy Giroux was the first officer to respond. (Giroux Dep. at 22.) From the description provided by the campers, Giroux concluded that Hegarty was the person shooting. (*Id.* at 21.)

Giroux was joined by Deputy Guay, Sergeant Hines, and State Trooper Wright. (Giroux Dep. at 46.) The officers collectively decided to arrest Hegarty.[4] They planned to try to persuade Hegarty to come out of the house but if that failed and they were successful in separating Hegarty from her firearm, they planned to enter the cabin. (Giroux Dep. at 55–59.) Wright warned the others "just because she's a woman, if things go bad, don't hesitate." (Wright Dep. at 124.) The four officers then left the truck stop and met Deputy Crawford at the intersection of Route 201 and the dirt road leading to the Hegarty cabin. (Giroux Dep. at 55.) The officers briefed Crawford about the situation and their plan of action. (*Id.*)

The officers then proceeded along the dirt road toward the Hegarty cabin. They parked their vehicles about seven-tenths of a mile from the cabin and walked the rest of the way into the area surrounding the cabin. (Giroux Dep. at 60.) When they arrived at the cabin, the officers heard music playing inside the cabin. (Wright Dep. at 166.) Gir-

oux began yelling to Hegarty, identifying himself and telling her that they wanted to speak with her. (Giroux Dep. at 76, 79–80.) Hegarty did not respond. *Id.* Hines also identified himself and rapped on the cabin door with his flashlight, also to no avail. (Hines Dep. at 145.)

After a few moments, Crawford shined his flashlight into Hegarty's bedroom where she appeared to have been lying down. (Crawford Dep. 121–22). Hegarty had a rifle on her bed and she pointed it toward Crawford. (*Id.*) Hegarty turned the volume down on her radio and asked who was at her window. (*Id.* at 123.) Crawford identified himself. (*Id.*)

Giroux then yelled again and Hegarty responded by asking what his intentions were. (Guay Dep. at 118.) Rather than telling Hegarty that she was the suspect of their investigation or that they intended to arrest her, Guay told Hegarty that they were investigating burglaries in the area and wanted to talk to her about them. (Guay Aff. ¶ 20.) Hegarty then repeatedly asked the officers what they wanted and asked them to leave her property. (Guay Dep. at 118–19.) During the conversation with Hegarty, the officers noticed that Hegarty appeared to be intoxicated or mentally unstable. (Guay Dep. at 122, Hines Dep. at 165–66.) The officers again asked Hegarty to come out of the cabin but she refused.

About this time, Hegarty moved from her bedroom to the front of the cabin. She knelt on her couch with her hands on the back of the couch looking out the window. (Guay Dep. at 120–21.) She no longer appeared to be armed. (*Id.* at 123.) Officer Guay, seeing that Hegarty was not armed at the time, told Hines "she doesn't have a gun, go." (Guay Aff. ¶¶ 24.) Hines then pulled open the screen door and repeatedly kicked in the front door which was locked with a chain.

---

4. Several of the officers had concerns about Hegarty's mental and emotional condition. Giroux's concerns were based on an incident in which Hegarty had to be sedated. (Giroux Dep. at 33–35.) Wright had arrested Hegarty the previous year for operating under the influence and the two became involved in a dispute at that time. (Crawford Aff. ¶ 11.) Wright told all of the other officers involved about the dispute.

(*Id.*) The details about the confrontation between Hegarty and Wright are contested but both Guay and Wright state that Hegarty was very intoxicated and was behaving irrationally at that time. (Guay Dep. at 91.) Plaintiff asserts that Wright and Guay treated Hegarty roughly during the OUI arrest, and, as a result, Hegarty filed an eight-page complaint against Wright. (Hegarty Aff. ¶¶ 7–8.)

(Hines Aff. ¶ 57.) Just as Hines entered the cabin, he heard Guay yell, "She's got a gun. Don't go." (*Id.* ¶ 59.) Once Hines was inside, Hegarty started to point her rifle at him. (*Id.*) Guay and Wright yelled to Hegarty to put down her gun. (Hines Dep. at 176–77.) When she did not do so, Hines, Wright, and Guay shot her. (*Id.* at 177). The shots were fatal.[5]

### III. § 1983

#### A. Qualified Immunity

■ All Defendants claim that they are entitled to qualified immunity. The standard for qualified immunity is that "government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Fonte v. Collins,* 898 F.2d 284, 285 (1st Cir.1990) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)). Because the factual and legal issues differ somewhat among Defendants, the Court will examine them in three groups: the individual officers who were at the scene, their supervisors, and Somerset County.

#### 1. *The Individual Officers* [6]

The relevant inquiry in determining whether Officers Giroux, Guay, Wright, Crawford, and Hines are entitled to qualified immunity is "whether, given the facts in the light most favorable to the plaintiff, the po-

lice officers have established as a matter of law, that it was reasonable for them to believe that their conduct did not violate [the plaintiff's] constitutional rights." [7] *Fonte,* 898 F.2d at 285–86.

■ In order to enter a home for the purpose of making an arrest, police first must have grounds to arrest the person they are seeking. In other words, police must have probable cause to believe that the person being sought has committed an offense. *Wong Sun v. United States,* 371 U.S. 471, 479–80, 83 S.Ct. 407, 412–13, 9 L.Ed.2d 441 (1963). For the purposes of this Motion, the Court will assume, without deciding, that probable cause existed to believe that Hegarty committed the offenses of criminal threatening, 17–A M.R.S.A. § 209(1) (1983),[8] and reckless conduct with a firearm, 17–A M.R.S.A. § 211(1) (1983).[9]

■ Even if probable cause to arrest the suspect exists, police may not enter that suspect's home without a warrant absent consent or exigent circumstances requiring such an entry. *Minnesota v. Olson,* 495 U.S. 91, 100, 110 S.Ct. 1684, 1690, 109 L.Ed.2d 85 (1990). "The test for whether exigent circumstances exist is 'whether there is such a compelling necessity for immediate action as will not brook the delay of obtaining a warrant.'" *United States v. Guarente,* 810 F.Supp. 350, 352 (D.Me.1993) (quoting *United States v. Almonte,* 952 F.2d 20, 22 (1st Cir.1991)). Exigent circumstances include: "[the] hot pursuit of a fleeing felon, [the]

---

5. The amount of time that elapsed between when the officers arrived on the scene and when Hegarty was shot is disputed with estimates ranging from about ten minutes to nearly a half hour. (Parsons Dep. at 225.)

6. The Court treats the five participating officers together despite the fact that Giroux and Crawford did not actually fire shots at Hegarty. All of the officers fully participated in the warrantless entry and thus proximately caused Hegarty's injuries. *See Gutierrez–Rodriguez v. Cartagena,* 882 F.2d 553, 560 (1st Cir.1989) (person proximately causes or subjects another to a constitutional deprivation if he "does an affirmative act, participates in another's affirmative acts, or omits to perform an affirmative act which he is legally required to do, that causes the deprivation of which complaint is made.") (quoting *Springer v. Seaman,* 821 F.2d 871, 879 (1st Cir.1987)).

7. Some of the events of the evening of May 16, 1992 are disputed. When considering a claim of qualified immunity, however, a court may rely on the facts as asserted by the plaintiff. *Mitchell v. Forsyth,* 472 U.S. 511, 527, 105 S.Ct. 2806, 2816, 86 L.Ed.2d 411 (1985).

8. 17–A M.R.S.A. § 209(1) provides that "[a] person is guilty of criminal threatening if he intentionally or knowingly places another person in fear of imminent bodily injury."

9. 17–A M.R.S.A. § 211(1) provides that "[a] person is guilty of reckless conduct if he recklessly creates a substantial risk of serious bodily injury to another person."

imminent destruction of the evidence, ... the need to prevent a suspect's escape, [and] the risk of danger to the police or to other persons inside or outside the dwelling." *Olson*, 495 U.S. at 100, 110 S.Ct. at 1690 (citations omitted). Other factors considered by federal courts to determine whether exigent circumstances exist include: the nature and gravity of the offense involved, whether police reasonably believed that the suspect was armed, whether there is strong reason to believe that the suspect is in the dwelling and committed the crime involved, the likelihood that the suspect will escape if not swiftly apprehended, whether the police entered forcibly without giving the suspect an opportunity to surrender, and whether the entry was made at night. *Dorman v. United States*, 435 F.2d 385, 392–93 (D.C.Cir.1970); *but see United States v. Adams*, 621 F.2d 41, 44 (1st Cir.1980) (although *Dorman* factors are helpful they are not to be used as a pass/fail checklist for determining exigency).

■ Exigent circumstances did not exist in this case nor was it reasonable for the officers involved to believe that such circumstances existed. There was no hot pursuit of a fleeing felon. In fact, when the officers first arrived on the scene, Hegarty appears to have been sleeping. There was virtually no likelihood that Hegarty would escape if not swiftly apprehended. Just before the officers began the forcible entry, Hegarty was kneeling on her couch within the sight of the officers and speaking with the officers. There was no risk of destruction of any evidence.

The officers assert that they knew Hegarty was armed and therefore feared that Hegarty would injure them or herself. The Court is not persuaded, however, that such fears were reasonable under these facts. In fact, several officers have stated that, just prior to the entry, Hegarty posed no immediate danger to themselves or anyone else. (Guay Dep. at 124; Giroux Dep. at 96–97). Hegarty repeatedly asked the officers to leave, but she neither threatened them nor did she fire any shots while the officers were present. In fact, the officers decided to enter Hegarty's home forcibly only after it appeared that she had put down her rifle.

Hegarty did not threaten injury to herself at any time, nor were there other individuals in danger. (Pl.'s Ex. C7 at 30.) *Cf. Guarente*, 810 F.Supp. at 352–53 (exigent circumstances existed when officers responding to a domestic dispute knew armed suspect was inside and others inside were possibly imperiled).

The entry itself was not peaceable but was made by breaking down the locked door to Hegarty's home. The Court also finds it troubling that the forcible entry was made late at night when Hegarty had been sleeping only moments earlier. *See United States v. Blair*, 366 F.Supp. 1036, 1039 n. 7 (S.D.N.Y.1973) (entry at 8:00 p.m. had "none of the surprise, shock and extreme invasion of privacy which might accompany rousing a suspect from [her] bed to make an arrest").

Finally, the officers never notified Hegarty of their true purpose before the entry. Although the officers asked Hegarty to come out of her home, they never told her that she was under investigation or that they intended to arrest her. Further, Hegarty could have doubted their authority, particularly in her inebriated condition. The officers left their vehicles more than a half mile from the cabin, so that there were no emergency lights to clearly identify them as police officers. While several of the officers identified themselves to Hegarty, it is not clear that she was able to see them through the darkness and after the officers shined flashlights in her face at least some of this time. (Guay Dep. at 124.)

Based on the facts viewed in the light most favorable to Plaintiff, the officers could not reasonably have believed that their forcible intrusion into Hegarty's home was justified by exigent circumstances. The officers are therefore not entitled to qualified immunity and their Motion for Summary Judgment on Count I of Plaintiff's Complaint is *DENIED*.

### 2. *The Supervisory Personnel*

Plaintiff named a number of supervisory personnel in his § 1983 claim: John Atwood, Commissioner of the Maine Department of Public Safety; Andrew Demers, Jr., Chief of the Bureau of Maine State Police; and Spencer Havey, Sheriff of Somerset County.

Plaintiff does not allege that these individuals were personally involved in the shooting incident, but bases his claim on supervisory liability.

■ A supervisor may not be liable under a theory of *respondeat superior. Febus–Rodriguez*, 14 F.3d at 91. A supervisor may be liable under § 1983, however, if his or her own conduct or inaction "amounted to reckless or callous indifference to the constitutional rights of others." *Gutierrez*, 882 F.2d at 562. "[R]eckless or callous indifference" has also been described as "deliberate indifference." *Id.* A plaintiff must also establish "an 'affirmative link' between the [subordinate's] misconduct and the action, or inaction of [the] supervisory officials" in order to establish liability under § 1983. *Id.* (quoting *Woodley v. Town of Nantucket*, 645 F.Supp. 1365, 1372 (D.Mass.1986)).

### a. Atwood and Demers

■ As Commissioner of the Maine Department of Public Safety and the Chief of the Maine State Police, Atwood and Demers bear ultimate responsibility for the training received by State Police Trooper Wright. Plaintiff contends that Atwood and Demers provided Wright with inadequate training in warrantless entries and the use of force in crisis situations. A failure to train may amount to deliberate indifference if a plaintiff can establish that "in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policy-makers ... can reasonably be said to have been deliberately indifferent to the need." *City of Canton v. Harris*, 489 U.S. 378, 390, 109 S.Ct. 1197, 1205, 103 L.Ed.2d 412 (1989). If that failure to train actually causes injury, those responsible for

training may be held liable under § 1983. *Id.*

■ The facts surrounding the training provided to the officers are not disputed. Wright received his initial training at the Maine State Police Academy. (Wright Dep. at 19.) The Academy requires state police officers to attend about 800 hours of training. (Demers Aff. ¶ 16.) At the Academy, Wright became familiar with the Maine State Police's policy on barricaded persons [10] and attended a one-day practical exercise on dealing with barricaded suspects. (Demers Dep. at 163.) During basic training, officers receive a copy of the Maine Law Enforcement Officer's Manual, that includes topics such as probable cause, entry of dwellings to effectuate arrest, and use of deadly force. (Harvey Aff. ¶ 10; Atwood & Demers' Ex. 168.) After the Academy, state police officers are also required to attend an eight-week field training program. (Demers Aff. ¶ 16.) Troopers also receive a quarterly educational newsletter containing information on police practice. (Harvey Aff. ¶ 14.) In addition to this basic training, Wright received training from the Basic Patrol Dog School in 1989 and 1992. (Reardon Aff. ¶ 28.) Each sixteen-week session of the Patrol Dog School included some training in search and seizure and the use of force. (*Id.* ¶ 27.)

Plaintiff's expert conceded that the number of hours of initial training required for Maine State Police exceeded the national average. (McClaran Dep. at 282.) Plaintiff's expert stated, however, that Atwood and Demers should have mandated at least eight hours of mandatory in-service training annually to teach a variety of topics including warrantless forcible entry, use of deadly force, multijurisdictional teams, tactical teams, barricaded persons, and constitutional rights. (*Id.* at 286–87.) Plaintiff further asserts that the fact that Wright knew of the

---

**10.** The Maine State Police's policy on barricaded persons, which was in place at the time of the Hegarty shooting, instructs officers that "by waiting the subject out, apprehension could possibly be made without danger or injury to the suspect or [the officer's] own personnel." That policy continues:

 If the suspect has acted in a manner that clearly indicates his intention to cause injury

or death and when conditions suggest that such outcome is likely, positive action must be taken to eliminate this threat by the use of chemicals or firearms ... [but] [t]he employment of firearms should only occur after the suspect has fired upon or threatened to fire upon an innocent person or police officer.

(Pl.'s Ex. B7 at 2.)

official policy regarding barricaded persons but did not follow it during the Hegarty shooting resulted from the lack of in-service training.

Plaintiff has failed to show that Atwood and Demers were deliberately indifferent to Wright's training in the area of warrantless entries and use of force. Wright's training did not violate any legally mandated standard. *See Febus–Rodriguez,* 14 F.3d at 92 (no liability where plaintiffs did not proffer any evidence that these specific practices violated a legally mandated standard). Plaintiff has offered no evidence showing that Atwood and Demers actually knew or should have known that there were any problems with their training program. *See id.* Plaintiff introduced no evidence to show that there were any previous problems with the training of Wright or any other state police officer. *See id.*

Plaintiff also asserts that the fact that Atwood and Demers did not discipline Wright after the Hegarty incident, despite the Attorney General's recommendation to do so, is evidence that they condoned Wright's conduct. A court may consider actions taken subsequent to an event to determine a policymaker's disposition prior to that event. *See Grandstaff v. City of Borger,* 767 F.2d 161, 171 (5th Cir.1985), *cert. denied,* 480 U.S. 916, 107 S.Ct. 1369, 94 L.Ed.2d 686 (1987) ("subsequent acceptance of dangerous recklessness by policymaker tends to prove his preexisting disposition and policy"). While it would appear that Wright clearly should have been disciplined for his involvement in the Hegarty incident, the Court does not find this evidence adequate, by itself, to support a conclusion that Atwood and Demers were deliberately indifferent to Wright's training. Because Plaintiff has failed to establish that Atwood and Demers were deliberately indifferent to the constitutional rights of Maine citizens in the training provided to Wright, the Court holds that Atwood and Demers are entitled to qualified immunity. The Court, therefore, *GRANTS* Atwood and Demers' Motion for Summary Judgment as to Count I of Plaintiff's Complaint.

### b. Sheriff Havey

As Sheriff of Somerset County, Defendant Havey directly supervised Officers Guay, Hines, Giroux, and Crawford. Plaintiff asserts that Havey was grossly negligent in the training and supervision of these officers and that this gross negligence rose to the level of deliberate indifference.

All of the Somerset County officers received training from the Maine Criminal Justice Academy. Guay and Crawford attended both the twelve-week basic police course as well as the 100–hour reserve training course at the Academy. (Guay Aff. ¶¶ 1–2, Crawford Aff. ¶ 3.) Giroux participated in the 100–hour reserve course only. (Giroux Aff. ¶ 5.) Hines attended the twelve-week basic police course and various unrelated courses at the Academy as well as the Ranger Academy. (Hines Aff. ¶¶ 2–4.) Both programs at the Academy included training in warrantless entries and dealing with armed suspects. (Crawford Aff. ¶ 3, Guay Aff. ¶ 2, Giroux Aff. ¶ 5.) In addition to the training provided by the Academy, Havey also required his officers to attend biannual training sessions on firearms and the use of deadly force. (Havey Aff. at ¶ 12).

Plaintiff's expert acknowledges that the number of hours of training required for the Somerset County officers was above the national average. (McClaran Dep. at 282.) Plaintiff's primary complaint with the training provided by Havey is the lack of mandatory in-service training. As support for his position, Plaintiff points to the findings of the Administrative Review Board that Havey established to investigate the Hegarty shooting. That Board recommended that "[s]pecific training in the areas of barricaded felons, crisis negotiations, and persons with substance abuse and mental instability should be implemented." (Havey Dep. Ex. 6 at 8.) Plaintiff also points to a prepared press release in which Havey stated "[t]he shooting is a tragedy that could have been prevented with proper training ... I agree that our officers are under trained...." (*Id.* at 90, Ex. 7 at 3.) Havey later recanted this statement.[11]

---

11. In his deposition, Havey stated that this statement did not reflect his opinion at the time but

■ It is not enough to show that an injury or accident "could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct." *City of Canton,* 489 U.S. at 391, 109 S.Ct. at 1206. "Such a claim could be made about almost any encounter resulting in injury." *Id.* A failure to provide specific training is not actionable in this instance unless it is so callous or reckless that it amounts to deliberate indifference. Even a total lack of training is not necessarily a constitutional violation. *See Rodrigues v. Furtado,* 950 F.2d 805, 813 (1st Cir.1991) (no official training or supervisory policy regarding body cavity searches did not result in § 1983 liability for supervisors).

■ Although the training that Havey provided may have been short-sighted, it was not deliberately indifferent. There was no evidence that Havey knew of a weakness in the training provided to his officers or that such a need was "so obvious" and the "inadequacy so likely to result in the violation of constitutional rights" that his inaction was "deliberately indifferent to the need." *City of Canton,* 489 U.S. at 390, 109 S.Ct. at 1205; *see also Febus–Rodriguez,* 14 F.3d at 92 (supervisor's training programs did not reflect a "conscious policy" to train his officers inadequately).

Plaintiff also asserts that Havey failed to adequately supervise the officers involved and thus created an atmosphere in which officers believed that reckless conduct would be condoned. Plaintiff argues that this indifference is demonstrated by the fact that prior to the shooting, Havey had instituted no standard operating procedure to deal with barricaded suspects, forcible entry, or warrantless entries, despite Havey's acknowledgement that such situations were not uncommon. (Havey Dep. at 154.)

Plaintiff also points to evidence of Havey's conduct after the shooting. He focusses, first, on Havey's hesitancy to implement standard policies even in light of the shooting,[12] and Havey's refusal to recognize the Hegarty incident as a barricaded suspect situation.[13] Plaintiff also points to Havey's decision not to discipline any of the officers involved, despite the recommendations of both the Attorney General and the Administrative Review Board to do so.

The Court does not condone Havey's failure to readily appreciate the existence of a barricaded suspect situation and the need for a cogent policy to guide officers in such a situation even after the Hegarty shooting. *See Grandstaff,* 767 F.2d at 171 (jury was entitled to conclude, from the fact that episode of dangerous recklessness received so little attention and action by city policymakers, that such actions were "accepted as the way things are done and have been done" in the city). The Court also finds significant the fact that there were a number of officers under Havey's supervision involved in the shooting rather than a single officer acting alone. This suggests that the actions of these officers are more likely representative of the unwritten policy or custom of the county than the actions of a single officer. *Bordanaro v. McLeod,* 871 F.2d 1151, 1160 (1st Cir.1989). Furthermore, given the recommendations of both the Attorney General and the Advisory Review Board established by Havey, the Court finds Havey's decision not to discipline the officers troublesome.

■ Despite serious concerns about Havey's supervisory abilities, however, the Court is not persuaded that Havey was deliberately indifferent to the constitutional rights of the citizens his officers are hired to protect. Plaintiff has not established that Havey had any advance notice that there was a problem with the supervision of his officers.

rather was "politically motivated to receive more money in [his] training account." (Havey Dep. at 91.)

12. After the shooting, Havey convened a group of attorneys to assist him in drafting a barricaded person policy. Havey announced, in February 1993, that the draft would be implemented but as of October 1993 he had not yet done so. (Havey Dep. at 140–42.)

13. Havey stated that he did not believe that Hegarty was a barricaded person because her chained door was not a barricade. (Havey Dep. at 163–65.) Rather he included in his definition of a barricade items such as couches, tables, stove, bars, stoves, sinks, and beds. (*Id.* at 164.)

**268**

See *Febus–Rodriguez,* 14 F.3d at 93 ("An important factor in determining whether a supervisor is liable ... is whether the official was put on notice of behavior which was likely to result in the violation of the constitutional rights of citizens."). In this scenario, there were no reports of past problems with the officers involved or with warrantless entries. The question is not whether Havey did all he could have but whether he did all that the Constitution requires. *Bowen v. City of Manchester,* 966 F.2d 13, 20 (1st Cir.1992) (quoting *Rellergert v. Cape Girardeau County,* 924 F.2d 794, 797 (8th Cir. 1991)). This Court is satisfied that, although Havey's actions were certainly suspect, they passed constitutional muster and therefore he is immune from suit under § 1983 because of qualified immunity. The Court *GRANTS* Havey's Motion for Summary Judgment as to Count I of Plaintiff's complaint.

### 3. *The County*

■■■ A local governmental body may be liable under § 1983 for providing an inadequate training program. *City of Canton,* 489 U.S. at 390, 109 S.Ct. at 1205. Liability may be imposed "where—and only where—a deliberate choice to follow a course of action is made from among various alternatives." *Id.* at 389, 109 S.Ct. at 1205. Because the Court finds that the County's primary policymaker, Havey, was not deliberately indifferent to the need to provide additional training, the failure to provide such training cannot justifiably be said to represent county policy. *Id.* The County is therefore immune from suit under § 1983. The Court *GRANTS* the County's Motion for Summary Judgment on Count I of Plaintiff's complaint.

### B. Plaintiff's Claim for Loss of Consortium under § 1983

■■■ Defendants contend that Plaintiff, individually, is not entitled to recover loss of consortium damages under § 1983. The Court agrees. The First Circuit has steadfastly held that "only the person *toward whom the state action was directed,* and not those incidentally affected, may maintain a § 1983 claim." *Pittsley v. Warish,* 927 F.2d 3, 8 (1st Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 226, 116 L.Ed.2d 183 (1991) (emphasis added). Plaintiff was not the subject of the officers' actions. The Court, therefore, GRANTS Defendants' Motion for Summary Judgment as it relates to Plaintiff's loss of consortium claims under § 1983. This decision, however, does not affect his status as a pendant party based on his state law claims. *See Rodriguez v. Comas,* 888 F.2d 899, 903 (1st Cir.1989) (although "[s]ection 1983 does not create a federal cause of action for the emotional distress of a spouse ... [a spouse may remain] as a pendent party plaintiff based on her state law claims.").

### C. State Limits on Damages under § 1983

■■■ Defendants contend that Plaintiff's recoverable damages under § 1983 are limited by 18–A M.R.S.A. § 2–804(b) (Supp. 1993).[14] The First Circuit has held, however, that:

[W]e believe, on balance, that the remedial purpose of [§ 1983] is better served by not permitting local variations allowing diminution of the amount of recovery. Rather, we will look to federal common law.

*Caperci v. Huntoon,* 397 F.2d 799, 800 (1st Cir.), *cert. denied,* 393 U.S. 940, 89 S.Ct. 299, 21 L.Ed.2d 276 (1968) (rejecting Massachusetts law restricting punitive damages in a § 1983 action); *see also Frett v. Virgin Islands,* 839 F.2d 968, 977 (3d Cir.1988) ("The presence of the section 1983 claim against the government ... effectively removes the

---

14. 18–A M.R.S.A. § 2–804(b) (Supp.1993) provides that:

The jury may give such damages as it deems fair and just compensation with reference to the pecuniary injuries resulting from such death to the persons for whose benefit the action is brought, and in addition thereto shall give such damages as will compensate the estate of the deceased person for reasonable expenses of medical ... [and] funeral expenses, and in addition thereto may give *damages not exceeding $75,000 for the loss of comfort, society and companionship of the deceased,* including any damages for emotional distress arising from the same facts as those constituting the underlying claim ... and in addition thereto may give *punitive damages not exceeding $75,-000....*

(Emphasis added.)

significance of the [Virgin Island's] Tort Claims Act $25,000 limit on judgments....").
The Court, therefore, denies Defendants' request that Plaintiff's damages be limited by 18–A M.R.S.A. § 2–804.

## D. Punitive Damages

 Defendants also request summary judgment on Plaintiff's demand for punitive damages. A jury may consider punitive damages in a § 1983 action if it finds either "reckless or callous disregard for the plaintiff's rights [or an] intentional violation[ ] of federal law." *Smith v. Wade,* 461 U.S. 30, 51, 103 S.Ct. 1625, 1637, 75 L.Ed.2d 632 (1983). If a jury accepts Plaintiff's version of the events, it may find a reckless or callous disregard of Hegarty's rights. The Court, therefore, DENIES Defendants' Motion for Summary Judgment on Plaintiff's demand for punitive damages as to his § 1983 claim.

## IV. Maine Civil Rights Act

In Count II of Plaintiff's Complaint, he asserts a claim under the Maine Civil Rights Act. That Act "was patterned after 42 U.S.C. § 1983." *Grenier v. Kennebec County,* 733 F.Supp. 455, 458 n. 6 (D.Me.1990). The same qualified immunity analysis applies under the Maine Civil Rights Act as under § 1983. *Jenness v. Nickerson,* 637 A.2d 1152, 1155 (Me.1994). The Court, therefore, DENIES the Motion of Defendants Wright, Guay, Crawford, Hines, and Giroux for Summary Judgment on Count II; and GRANTS the Motion of Defendants Atwood, Demers, Havey, and the County for Summary Judgment on Count II.

## V. State Claims

Plaintiff also brings two state claims, Count III (wrongful death) and Count IV (trespass). Both are governed by the terms of the Maine Tort Claims Act, 14 M.R.S.A. § 8101–8118 (1980 & Supp.1993).

## A. Discretionary Immunity

The individual officers and the supervisory Defendants contend that they are entitled to summary judgment on Plaintiff's state tort claims because they are protected by discretionary immunity. The Maine Tort Claims Act provides absolute immunity for employ-ees of governmental entities for "[p]erforming or failing to perform any *discretionary* function or duty, whether or not the discretion is abused...." 14 M.R.S.A. § 8111(1)(C) (Supp.1993) (emphasis added).

### 1. *Officers*

 An officer is exercising a discretionary function if he or she is "required to use [his or her] judgment while acting in furtherance of a departmental policy [or a legislatively imposed duty]." *Moore v. City of Lewiston,* 596 A.2d 612, 616 (Me.1991). Making a forcible entry to effectuate a warrantless arrest and the subsequent use of deadly force are discretionary functions. *See McPherson v. Auger,* 842 F.Supp. 25, 29 (D.Me.1994) ("Making a warrantless arrest is a discretionary function."); *Leach v. Betters,* 599 A.2d 424, 426 (Me.1991) (parties agreed that warrantless arrest was a discretionary function); *McLain v. Milligan,* slip op. at 14, 847 F.Supp. 970, 977 (D.Me.1994) ("Defendant's decision to enter Plaintiff's home [and] to execute a warrantless arrest ... all required the exercise of judgment and hence qualify as discretionary functions under the Act."); *Roy v. City of Lewiston,* No. 93–218, slip op. at 4–5, 1994 WL 129774 (D.Me. Feb. 18, 1994) (officer's decision to use force was discretionary function).

 Discretionary immunity is unavailable, however, when the officer's conduct was so egregious that it "clearly exceeded, as a matter of law, the *scope* of any discretion he could have possessed in his official capacity as a police officer." *Polley v. Atwell,* 581 A.2d 410, 414 (Me.1990) (emphasis in original). This standard differs from that of qualified immunity. *See Maguire v. Municipality of Old Orchard Beach,* 783 F.Supp. 1475, 1487 (D.Me.1992) (finding some defendants entitled to discretionary immunity but not qualified immunity and another defendant entitled to qualified immunity but not discretionary immunity); *see also McPherson,* 842 F.Supp. at 28, 30 (finding some defendants entitled to discretionary immunity but not qualified immunity). The Court is satisfied that, even assuming that the facts are as asserted by Plaintiff, the officers' conduct did

not *clearly* exceed, as a matter of law, the scope of *any* discretion they could have possessed. The Court, therefore, GRANTS summary judgment in favor of Defendants Wright, Guay, Hines, Giroux, and Crawford on Counts III and IV.

### 2. *Supervisory Personnel*

■ Defendants Atwood, Demers, and Havey contend that they are entitled to discretionary immunity pursuant to 14 M.R.S.A. § 8111(1)(C) (Supp.1993). The Court agrees. The decisions challenged by Plaintiffs in this case involve training and supervision of officers. These functions require the "exercise of basic policy evaluation, judgment, and expertise on the part of the governmental agency involved," therefore, the Court finds that they are discretionary functions. *Polley*, 581 A.2d at 413. Furthermore, the actions of these Defendants did not clearly exceed the scope of their discretion. The Court, therefore, GRANTS summary judgment in favor of Defendants Atwood, Demers, and Havey on Counts III and IV.

### B. Governmental Entity Immunity

The Maine Tort Claims Act grants broad immunity for governmental entities in 14 M.R.S.A. § 8103(1) (1980):

> Except as otherwise expressly provided by statute, all governmental entities shall be immune from suit on any and all tort claims seeking recovery of damages.

Section 8104–A provides four narrow exceptions to the immunity, none of which apply to the facts of this case.

■ A governmental entity may waive its immunity, however, by procuring liability insurance. *See* 14 M.R.S.A. § 8116 (Supp. 1993). The County bears the burden of establishing whether or not it was insured at the time of the shooting. *McLain*, 847 F.Supp. 980 (citing *Hill v. Town of Lubec*, 609 A.2d 699 (Me.1992)). The County concedes that, "[a]t all times pertinent to the allegations in the Complaint," it had "comprehensive law enforcement liability insurance." (Fisher Aff. ¶ 3.) The County made no attempt to establish that this policy did not cover the substantive issues involved. The Court, therefore, DENIES the County's Motion for Summary Judgment on Counts III and IV.

### C. Punitive Damages

■ The County also moves for summary judgment on Plaintiff's demand for punitive damages. The County has established that its liability insurance specifically excludes coverage for punitive damage awards. (*See* Fisher Aff. ¶ 4.) The waiver provisions of § 8116 do not apply, therefore, to the punitive damages portion of Plaintiff's claim. The Court, therefore, GRANTS the County's Motion for Summary Judgment as it relates to punitive damages in Counts III and IV.

## VI. CONCLUSION

The Court DENIES the Motion for Summary Judgment on Counts I and II of Defendants Wright, Guay, Hines, Giroux, and Crawford. The Court GRANTS the Motion for Summary Judgment on Counts I and II of Defendants Atwood, Demers, Havey, and Somerset County. The Court DENIES Defendants' Motion for Summary Judgment on Plaintiff's demand for punitive damages as it relates to Counts I and II. The Court GRANTS Defendants' Motion for Summary Judgment as it relates to Plaintiff's loss of consortium claims under § 1983.

The Court GRANTS the Motion for Summary Judgment on Counts III and IV of Defendants Wright, Hines, Guay, Giroux, Crawford, Atwood, Demers, and Havey. The Court DENIES the Motion for Summary Judgment on Counts III and IV of Somerset County. The County's Motion for Summary Judgment regarding punitive damages on Counts III and IV is GRANTED.

*SO ORDERED.*